Nakia A. ROY, Appellant,

v.

UNITED STATES, Appellee.

Steve B. ROSS, Appellant,

v.

UNITED STATES, Appellee.

Nos. 92–CF–1560, 92–CF–572.

District of Columbia Court of Appeals.

Argued Oct. 5, 1994.

Decided Jan. 19, 1995.

Matthew C. Leefer, appointed by this court, Frederick, MD, for appellant Roy.

Suzanne D. Sager, appointed by this court, Washington, DC, for appellant Ross.

Barbara A. Grewe, Asst. U.S. Atty., with whom Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Asst. U.S. Atty., Washington, DC, were on the brief, for appellee.

Before STEADMAN, SCHWELB and FARRELL, Associate Judges.

SCHWELB, Associate Judge:

Nakia A. (Tony) Roy and Steve B. Ross were convicted at a joint trial of armed robbery,[1] possession of a firearm during the commission of a crime of violence (PFCV),[2] and carrying a pistol without a license (CPWOL).[3] Ross was also convicted of obstruction of justice.[4] On appeal, Roy contends that the trial judge erred in denying his motion for judgment of acquittal (MJOA) on all charges, and he alleges related instructional error.[5] Ross claims that the judge erred in denying his motion to sever offenses.

We hold that the evidence was insufficient as a matter of law to support Roy's convictions of armed robbery and of PFCV. We affirm Roy's CPWOL conviction and all of Ross' convictions.

## I.

### THE EVIDENCE

*A. The Robbery.*

This case had its genesis in an attempt by law enforcement officers to purchase a handgun through the use of a paid informant. The proposed undercover buy went awry when the prospective purchaser was robbed of his money instead.

On October 8, 1991, Peppi Miller, who was later to become the principal prosecution witness, was arrested on 10th Place in southeast Washington, D.C. and charged with possession of cocaine with intent to distribute it. Six weeks later, on November 20, 1991, Miller was working as an informant for Agent Mark Potter of the Bureau of Alcohol, Tobacco and Firearms (BATF). With Potter's advance knowledge, Miller undertook to arrange the undercover buy which generated the events underlying this case.

Miller testified that during the mid-afternoon of November 20, on 10th Place, S.E., he met with Tony Roy, whom he had known for

1. D.C.Code §§ 22–2901, –3202 (1989). Unless otherwise specified, references in this opinion to the District of Columbia Code are to the 1989 revision.

2. D.C.Code § 22–3204.

3. D.C.Code § 22–3204(a).

4. D.C.Code § 22–722(a)(1).

5. Roy also complains of one of the judge's evidentiary rulings. In light of our disposition of his appeal, we do not reach this claim.

several years, to discuss the purchase of a handgun and ammunition. Roy told Miller that he should come back later with $400, and that Roy would then have the weapon and two ammunition clips. Miller left the scene and met with Potter and two FBI agents. These men gave him $400 in bills and equipped him with a tape recorder and a transmitter.

At approximately 6:40 p.m., Miller returned to the scene and found Roy, who was with several other people. Miller activated his tape recorder and approached Roy to discuss the proposed purchase. Roy asked Miller if he had brought the money, and Miller showed him the bills. Roy then explained that Miller would have to wait for "Steve" [Ross], who was to bring the handgun.

Ross arrived some 45 minutes later, but he and Roy left with another man, apparently to remedy problems with Ross' car. The three men subsequently returned, and Miller asked Roy "what was up." Ross, meanwhile, walked towards the grounds of a nearby school. Roy told Miller that Steve had brought the handgun and that Miller should "go talk to Steve and get it from Steve."

Miller followed Ross through a gate into the school yard and down some steps to a location approximately thirty yards from the entrance. Roy remained in the vicinity of a blue trash can which was near the gate. Miller caught up with Ross, and at trial he described the ensuing events as follows:

He [Ross] said, "What's up?" I said, "What's up?" He said, "you got the money?" I said, "Yes, I have the money." And then, I pulled the money out [of] my pocket, and he said, "Is it 350?" I said "No, it's 400." And then he said, "Count it," so I started counting it, and then he gave me the gun, and when he gave me the gun, I got ready to give him the money, and then he asked for the gun back. So, right then and there, I gave the gun back,

and he said, "I really don't want to sell it right now."

So, then, I was, like you know, "Tony," [6] you know. I was calling him, "Tony" you know, to see what was going on, and then he put the clip into the chamber, pulled the round back, pointed the gun in my face and said for me to drop the money.

. . . I asked him why he was doing this.

. . . Then he said that he felt as though I had stuck up his people, and that he didn't want to tell me this. He said, "Motherfucker, you stuck my peoples up."

. . . Then I said, "No, I didn't do that—" I had, ". . . I never had a gun to do that."

. . . And then he told me to run.

. . . At that time, he had told me to put the money on the ground.

. . . Then I started to back up, and then he said, "I'm not playing with you, I told you." He said, "Better yet, jump the fence," so I jumped the fence.

. . . Then I gave off the distress signal . . . Ace of Spades . . . and gave a description of the clothes that he was wearing.

. . . At that point, I started walking toward Tenth Place by the back of the school.

Officers promptly responded to Miller's distress signal. Within two minutes, they had apprehended Roy, Ross, and several other individuals who were in the area. Roy and Ross were standing approximately five feet apart near the entrance to the school at the time of their capture. The officers recovered $600 in cash from Ross' front pants pocket; bills totalling $400 were bundled separately from the other money, and a BATF agent testified that these bills were in the same denominations as those which had been provided to Miller earlier.[7] A loaded handgun bearing Ross' fingerprint was found near the gate.

6. Presumably, Miller meant to say "Steve" [Ross], not "Tony" [Roy]. There is no evidence that Roy was on the scene or personally participated in this conversation or the robbery that followed.

7. The serial numbers of the bills had not been pre-recorded.

## B. The Obstruction of Justice.

Miller testified that on December 9, 1991, nineteen days after the robbery, he was approached by Ross and two other men. He claimed that Ross asked him about being a "snitch" and said that if he (Ross) had a gun, he would "bust" Miller on the spot. After further conversation, according to Miller,

> [r]ight then and there he said why don't I go ahead and drop the charges because it's not even worth all of that. So, after that, I was, like, well, why did you point the gun at my face if we were so much friends. He said that he was going to give me the money back.[8]

## II.

## ROY'S APPEAL

### A. The Trial Court's Rulings.

At the conclusion of the prosecution's case, Roy's attorney made an oral motion for judgment of acquittal (MJOA). She argued that

> my client is not charged with selling of the gun, or even planning to sell a gun; he's charged with an armed robbery of Peppi Miller, and I think, based on the evidence . . . that a reasonable juror could not conclude that he participated, in any fashion, with a person by the name of Steve Ross in this alleged armed robbery.

Counsel renewed her MJOA at the conclusion of the evidence. The trial judge denied each MJOA without elaboration, but his views are readily discernible from his thoughtful discussion of related instructional and other issues.

The judge stated that

> it seems to me there are two separate and distinct theories of aiding and abetting that may enable a factfinder to find Mr. Roy guilty, beyond a reasonable doubt, of the armed robbery.
>
> The first is, if a factfinder could find from that evidence, beyond a reasonable doubt, that he actually aided and abetted the armed robbery; that is, he knowingly

and intentionally participated with Mr. Ross in the armed robbery . . . That's one theory.

> There is another theory. There is a separate and more difficult theory of vicarious aider and abettor liability that would hold Mr. Roy liable for armed robbery if he knowingly and intentionally aided and abetted Mr. Ross in an illegal act; that is, the sale of a gun; and whether he intended it or not, the armed robbery by Mr. Ross was the natural and probable consequence in the ordinary course of things, of the act that he, Mr. Roy, aided and abetted and set in motion.

For the convenience of the reader, we will refer to the "knowingly and intentionally participated" theory as "Theory A," and the "natural and probable consequences" theory as "Theory B."

During preliminary discussions which preceded the presentation of the evidence, the judge indicated an inclination to limit the prosecution to Theory A—"they're either going to prove that Mr. Roy was knowingly and intentionally involved in [the armed robbery] or they are not." Returning to the issue during the presentation of the evidence, the judge reaffirmed his preliminary impression:

> I tend to think . . . if all the jury could find is that Mr. Roy arranged for the sale of a gun, and that's all he intended to arrange, and there's no evidence from which a jury could infer that he had knowledge and intention that this was going to evolve into an armed robbery, that that might not be sufficient to prove his liability for armed robbery as an aider and abettor.
>
> . . . I doubt whether I'm going to conclude that it goes so far as to say, if you plan and participate in the sale of the gun, and whatever happens, no matter how much it was part of the original plan, is something for which you're held criminally accountable.

The prosecution, however, asked the judge to instruct the jury on both theories, and the

---

8. Much additional evidence was presented at trial. Miller, who was in the government's witness protection program at the time of trial, was extensively cross-examined and impeached. The tape was played for the jury. Neither defendant testified, but each presented witnesses. We have related here only so much of the evidence as we consider relevant to the issues on appeal.

judge attempted conscientiously to analyze the reach of Theory B:

> The case law that I've seen so far does not define very precisely what, in the ordinary course of things, natural and probable consequences means. And as I think of the facts of this case, in the context of the facts of the cases that I've looked at, in my view, this one is on the edge. So much so that I'm not even certain, at this point, whether I'll let this second theory be submitted to the jury and argued by the Government. . . .
>
> [A]s I see it, what the criminal law is trying to do in these cases is to draw a line to serve two different policies that are incompatible, or inconsistent with each other. On the one hand, there's clearly a policy in the criminal law not to hold people responsible for things that they did not intend to do, and there has to be some *mens rea* element for any criminal offense. On the other hand, there is a competing policy that says, if you put criminal conduct in motion, or you intentionally assist in the commission of a crime, then you are held responsible for the natural and probable consequences of that crime, even if they go beyond what you put in motion . . . Somewhere between those two things, the law draws a line in what you can be held liable for, and what you can't.

The judge ultimately ruled as follows:

> [T]he conclusion I've reached is [that] . . . the alternative doctrine of aiding and abetting on which the government is relying in the case of Mr. Roy is supported by the case law, but it is . . . law that ought to be examined again by our Court of Appeals in my opinion.
>
> And it strikes me that what has happened, as so often happens, in the development of common law principles, is that an early court borrowed a doctrine that was really an exception applicable in the case of the felony murder doctrine and then grafted it onto the law of aiding and abetting generally, actually borrowed it from two sources, from felony murder and from the law of conspiracy, and then grafted it onto the law of aiding and abetting as it applies to the commission of any particular offense and then repeated it so often that it became self-fulfilling without much analysis in the later cases.
>
> In my opinion this case represents the outer reaches of the permissible use of the doctrine that a person can be criminally liable for an offense which he himself did not intend but which is arguably a natural and probable consequence of an offense which he did intend and which he did aid and abet the commission of by another.

In conformity with the foregoing analysis, the judge denied Roy's MJOA and instructed the jury both as to Theory A and as to Theory B.

*B. The Scope of Review.*

 In reviewing the trial judge's denial of Roy's MJOA, we consider the evidence in the light most favorable to the prosecution. *Parker v. United States,* 601 A.2d 45, 51 (D.C.1991). We may not usurp the jury's prerogative of determining credibility. *Id.* We can determine that the evidence is insufficient only if we conclude, as a matter of law, that no impartial juror could rationally find guilt beyond a reasonable doubt on the evidence presented. *Id.* The evidence is insufficient, however, if "in order to convict, the jury is required to cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987).

 In the present case, as we have seen, two separate theories of aiding and abetting were presented at trial, and the jury returned a general verdict of guilty. Under these circumstances, we must affirm Roy's relevant convictions if the evidence was sufficient to support either theory. *United States v. Morris,* 298 U.S.App.D.C. 142, 145–46 n. 1, 977 F.2d 617, 620–21 n. 1 (1992) (citing *Griffin v. United States,* 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)).

*C. Theory A.*

 There was ample evidence that, while armed with a handgun, Steve Ross robbed Peppi Miller of his money. The prosecution's testimony, if credited, also established that Tony Roy participated in the planning of

an illegal sale of a handgun to Miller. The question presented under the rubric of Theory A is whether the evidence, viewed in the light most favorable to the prosecution, was sufficient to support a finding that Roy knowingly and intentionally aided and abetted the armed robbery.

■ To establish aiding and abetting, the prosecution was obliged to prove that Roy "in some sort associate[d] himself with the venture, that he participated in it as something that he wishe[d] to bring about, that he seek by his action to make it succeed." *Brooks v. United States*, 599 A.2d 1094, 1099 (D.C.1991) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938) (Learned Hand, J.)). "In order for one to be an accomplice [or an aider or abettor], he must be concerned in the commission of *the specific crime with which the [principal] defendant is charged*, he must be an associate in guilt of *that crime*, a participant in that offense as principal or accessory." *Risinger v. United States*, 236 F.2d 96, 99 (5th Cir.1956) (emphasis added).

There was no direct evidence that Roy planned the robbery or, indeed, that he had any advance knowledge that a robbery would occur. Indeed, if Miller's account is credited, then Ross' decision to rob him appears to have been improvised at the last moment, and not planned in advance. According to Miller, Ross actually gave him the handgun. Although it may theoretically be possible

that a man intent on robbing another would place the weapon (loaded or not) in his prospective victim's physical possession, we do not believe that an impartial jury could rationally conclude beyond a reasonable doubt that this is what occurred here. If, as Miller's testimony suggests, Ross did not decide to rob Miller until after both men had arrived at the scene of the crime, then the theory that Roy helped to plan the robbery in advance cannot reasonably be reconciled with the record.

According to the government, the jury could infer that Roy helped to plan the robbery on the basis of circumstantial evidence. We have considered all of the facts of record cited by the government in support of this proposition, however, and we conclude that each such fact is just as consistent with the hypothesis that Roy continued to contemplate a gun sale as it is with the alternative hypothesis that he participated in the planning or execution of the robbery.[9] We recognize that perspective matters, and that an inference that seems reasonable to one person may appear wildly speculative to a second, especially if it operates to the second's disadvantage. Nevertheless, we are satisfied that several of the government's arguments, objectively viewed, go well beyond reasonable inferences from the record and invite rank speculation.[10] Guilt must be proved beyond a reasonable doubt, and a defendant may not be deprived of his liberty on the basis of such conjecture.

9. The government points out, for example, that Ross and Roy were friends and that they were standing together when they were arrested. Friends can plan to sell guns as readily as they can cooperate in an armed robbery, and they may stand together regardless of which crime Roy intended to commit. Roy directed Miller to follow Ross to the location where the robbery occurred, but this is precisely what one would expect him to do if he wished to help consummate the planned sale of the pistol. Roy remained at the entrance to the school, and the government hypothesizes that he was a lookout. Even if we assume that he was, however, a lookout may as readily be used to protect a gun sale as a robbery.

The government also asserts that the people on the street already knew of the prospective gun sale, and that the effectuation of the transaction in the relative privacy of the schoolyard indicates that a robbery must have been planned. This

claim also rests on surmise; obviously the open transfer of a pistol on the street would present the risk that persons other than the friends of the principals would witness an illegal transaction.

We recognize that events which actually follow a discussion between confederates may ordinarily be quite probative of what they in fact planned. In the present case, however, any such inference is cuttingly marred by Ross' transfer of the pistol to his victim before the robbery.

10. *E.g.*, the government argues that "Roy left the area and returned with Ross, giving the two accomplices an opportunity to plan and discuss the robbery in lieu of the gun sale." It goes on to state that "[a]fter the robbery, Ross returned to the very area where Roy was standing guard. The jury could infer that Ross was returning to his comrade to inform him that the robbery had been successful and to split the proceeds with him." Both of these assertions, in our view, are based on pure conjecture.

## D. Theory B.

█ The trial judge, as we have seen, expressed serious reservations regarding the applicability to the facts of record of the government's "natural and probable consequences" theory. Although the judge's initial leaning was to restrict the prosecution to Theory A, and although he recognized that the present case took him to the "outer reaches" of Theory B, the judge ultimately allowed the case to go to the jury on both theories, while expressly inviting this court to clarify the legal principles applicable to Theory B. We share the trial judge's initial reservations, and now conclude that the evidence was insufficient as a matter of law to support Roy's conviction pursuant to Theory B.

By invoking the "natural and probable consequences" theory, *the government insists* that we sustain Roy's convictions of armed robbery and PFCV without requiring a showing that Roy intended to participate in the robbery of Miller or in any other crime of violence. Armed robbery is a felony punishable by life imprisonment; selling a handgun, on the other hand, constitutes CPWOL,[11] a misdemeanor of which Roy has been independently convicted.[12] The government's application of the "natural and probable consequences" doctrine would thus dramatically expand Roy's exposure even where (as postulated here for purposes of Theory B) he did not intend that a crime of violence be committed. *See generally* 2 WAYNE R. LaFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW, § 6.8 at 158 (1986 & Supp.1994).

█ This court has stated that "an accessory is liable for any criminal act which *in the ordinary course of things* was the *natural and probable* consequence of the crime

that he advised or commanded, although such consequence may not have been intended by him." *Morriss v. United States,* 554 A.2d 784, 789 (D.C.1989) (emphasis added) (quoting *Hackney v. United States,* 389 A.2d 1336, 1342 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979)); *see also Ingram v. United States,* 592 A.2d 992, 1001 (D.C.), *cert. denied,* 502 U.S. 1017, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991). The italicized words place a number of obvious restrictions on the reach of Theory B. The phrase "in the ordinary course of things" refers to what may reasonably ensue from the planned events, not to what might conceivably happen, and in particular suggests the absence of intervening factors.[13] "Natural" has many meanings, but the most apposite dictionary definition is "in accordance with or determined by nature." [14] A natural consequence is thus one which is within the normal range of outcomes that may be expected to occur if nothing unusual has intervened.[15] We need not define "probable," except to note that, even standing alone, this adjective sets a significantly more exacting standard than the word "possible." Accordingly, if we accord to the words of our cases their ordinary everyday meaning, it is not enough for the prosecution to show that the accomplice knew or should have known that the principal might conceivably commit the offense which the accomplice is charged with aiding and abetting. Without inserting additional phrases or adjectives into the calculus, we think that our precedents require the government to prove a good deal more than that. A "natural and probable" consequence in the "ordinary course of things" presupposes an outcome within a reasonably predictable range. .

---

11. But *see also* D.C.Code § 22–3207, prohibiting sales of pistols to certain persons.

12. In the absence of applicable federal "gun control" legislation, Roy could have sold a handgun to Miller in some jurisdictions without committing any offense at all.

13. In *Morriss, supra,* for example, we noted that "the chain of events initiated by Morriss ... led in a steady progression to the [victim's] ensuing death." 554 A.2d at 789–90. The contemplated "roughing up or something like that," *id.* at 789–

90, in other words, was quantitatively, but not qualitatively, different from the eventual outcome, murder. In this case, on the other hand, we think a gun sale is qualitatively different from armed robbery.

14. *See* PHILIP B. GOVE, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1506 (1986).

15. Intervention in this sense may refer not only to physical happenings but also to mental events, such as an inexplicable shift of mind unrelated to the original plan.

We turn to the facts at hand. We stated in *Hordge v. United States,* 545 A.2d 1249 (D.C.1988) that "one who aids and abets a felony is legally responsible for all acts of the other persons which are in furtherance of the common purposes, design, or plan to commit the felony." *Id.* at 1256 (quoting *Battle v. United States,* 515 A.2d 1120, 1128 (D.C. 1986)). The government contends that the armed robbery of Miller was in furtherance of the common purpose because it resulted in the defendants' obtaining Miller's money—an achievement which, according to the government, was the defendant's prime design and plan in the first place. In our view, however, an exchange of a handgun for $400 is qualitatively different from an armed robbery in which Ross stole $600 and retained for himself the object which, in Roy's contemplation, was supposed to be sold. Not the least of the differences is that violence directed to the intended buyer may ricochet against the seller-turned-assailant. To suggest that a sale and an armed robbery have a common purpose is to exaggerate their similarities and to understate their differences.

The government argues that Peppi Miller was a logical target of a robbery because, "given the illegal nature of the activity in which he was involved, [he] was unlikely to file a complaint with the police about the robbery." [16] This reasoning, however, recognizes no apparent limiting principle. If we were to accept the government's position, then the robbery of any buyer or seller in a drug or unlicensed pistol sale would be viewed as the "natural and probable consequence" of that transaction, for a participant in any illegal project may well be reluctant to invoke the aid of the constabulary. [17] Moreover, as Roy points out, the buyer may be as likely to rob the seller as the seller is to rob the buyer; the government's reasoning would arguably sustain prosecution of Roy as an aider and abettor of armed robbery even if Miller had robbed Ross, rather than the other way around.

In this case, in our view, no impartial jury could rationally conclude, beyond a reasonable doubt, that Roy "cross[ed] a moral divide by setting out on a project involving either the certain or contingent" commission of a robbery. *Cf. United States v. Powell,* 289 U.S.App.D.C. 131, 134, 929 F.2d 724, 727 (1991). Viewed in the light most favorable to the prosecution, the evidence would perhaps support a finding that Roy should have known that it was conceivable that Ross might rob Miller. The evidence was insufficient, however, to show that a robbery would follow in the "ordinary course of events," or that it was a "natural and probable consequence" of the activities in which Roy was shown to have engaged. We must therefore reverse for evidentiary insufficiency Roy's conviction for armed robbery.

Armed robbery was the predicate "crime of violence" on which the government relies to sustain Roy's PFCV conviction. Indeed, according to the government, it was "Roy's complicity in the armed robbery [which] established his complicity in possessing the weapon which was used to effectuate the robbery." Because the government has failed sufficiently to connect Roy to the predicate offense, his conviction for PFCV likewise cannot stand. *See Whitaker v. United States,* 617 A.2d 499, 501 (D.C.1992). [18]

---

**16.** The prosecutor asked an officer, who had not been qualified as an expert, whether it would be unusual for an undercover purchaser of contraband to be robbed. The officer answered in the negative. Roy's counsel objected, and the trial judge overruled the objection. Immediately thereafter, however, the judge precluded further testimony on the point, reasoning that a fact witness ordinarily should not testify as an expert and that the witness was in effect being asked an "ultimate question." We do not think that the officer's negative answer to the question materially enhanced the sufficiency of the prosecution's evidence.

**17.** This does not mean, on the other hand, that it is safe to rob a criminal. Indeed, the possibility of retaliatory measures may act as an especially powerful disincentive to any notion of robbing a wrongdoer; the prospect of apprehension by the authorities may be far less effective in deterring crime. It is worth noting that, in the present case, according to Miller, Ross claimed he was robbing him to avenge an earlier stickup of Ross' own confederates.

**18.** Because we reverse Roy's convictions for armed robbery and PFCV, we need not reach his allegations of instructional error relating to these offenses.

*E. Carrying a Pistol Without a License.*

■ Roy contends that there was no evidence that he ever carried the handgun or had it in his possession. He claims that, under all of the circumstances, the trial judge should have granted his MJOA on the CPWOL count as well. We disagree.

■ The government's evidence, if credited, showed that Roy and Ross were associated together "in an ongoing venture centering around the possession of [an unlicensed] pistol," *see Brown v. United States,* 546 A.2d 390, 397 (D.C.1988), which they proposed to sell to Miller. This was sufficient to establish joint constructive possession, *id.,* for the two men had the requisite ability and intention jointly to exercise dominion and control over the weapon and to guide its destiny. *In re T.M.,* 577 A.2d 1149, 1151 n. 5 (D.C.1990). We agree with the government that "Roy's action in negotiating the deal with Miller directly caused the pistol to be carried and possessed in the District of Columbia on November 20, 1991. That the gun deal never came to fruition is immaterial." [19]

### III.

### ROSS' APPEAL

Prior to trial, Ross moved the court to sever the obstruction of justice count against him from the remaining counts. His attorney made an *ex parte* presentation to the trial judge in which she explained the grounds for her motion. At the conclusion of that presentation, the judge denied the motion, stating his reasons as follows:

> I think it is fair to say that Mr. Ross, at a separate trial, might wish to testify on the obstruction of justice charge, and might not wish to testify on the armed robbery charge for reasons Ms. Sager[20] has elaborated to some extent. But, I'm not satis-

fied that that justifies a severance in this case of what are clearly, properly and really necessarily joined offenses.

> For the reasons we discussed on Friday, the evidence of the armed robbery in the Government's case is going to be ... admissible ... on the obstructing justice charge, even if it were tried separately, and the evidence of the obstructing justice charge would be admissible in the armed robbery case, even if it were tried separately, and there would be no way to separate the two, since it is the government's theory [that] the armed robbery provides the motive for the obstruction, and [that] the obstruction demonstrates consciousness of guilt for the armed robbery.

> Under the case law, these charges are clearly properly joined. They would be joined properly under [Super.Ct.Crim.] Rule 8(a), if Mr. Ross were tried alone, and they are joined properly under Rule 8(b), when he's joined properly with Mr. Roy.

> It may well be, if he chooses to testify and limits his testimony to the encounter in December with Mr. Miller, putting his own interpretation on that encounter, that I will limit, to some extent, cross-examination of him about the armed robbery itself, although some cross-examination about that will inevitably be proper. I will try to limit the scope of cross in a way that it doesn't prejudice Mr. Ross any more than necessary, if he chooses to limit his testimony to the alleged obstruction of justice incident.

> \* \* \* \* \* \*

> For those reasons, the motion to sever is denied. Mr. Ross may or may not testify. If he does, he may or may not testify about both incidents. If he testifies only about one of them, then I will rule at that time

---

**19.** Roy's CPWOL conviction can also be sustained on an aiding and abetting theory. "To say that [a defendant] cannot be convicted [of aiding and abetting possession] without proof of possession is to say that one cannot be an aider and abettor unless one commits the principal offense, which would obliterate the crime of aiding and abetting." *United States v. Poston,* 284 U.S.App. D.C. 125, 129, 902 F.2d 90, 94 (1990) (quoting *United States v. Wesson,* 889 F.2d 134, 135 (7th Cir.1989)) (brackets in original). If Peppi Mil-

ler's testimony is credited, then Roy "associate[d] himself with [Ross' possession of a pistol and] participate[d] in it as something that he wishe[d] to bring about, that he [sought] by his action to make it succeed." *Brooks, supra,* 599 A.2d at 1099 (citations omitted).

**20.** Ms. Suzanne Sager was Ross' attorney in the trial court and on appeal.

on what the scope of cross-examination should be.

██ On appeal, Ross' sole contention [21] is that the trial judge abused his discretion in denying his motion for a severance.[22] We agree with the judge's analysis, however, and conclude that he did not abuse his "very considerable discretion," *Lemon v. United States*, 564 A.2d 1368, 1370–71 (D.C.1989), in denying the motion.

Ross relies on *Cross v. United States*, 118 U.S.App.D.C. 324, 326, 335 F.2d 987, 989 (1964), for the proposition that severance was called for even if the evidence of each offense would have been admissible at the separate trial of the other. He argues, and *Cross* suggests, that an accused may be prejudiced if he is effectively compelled to testify on one count upon which he wishes to remain silent as a result of the joinder of several offenses for trial. *See also Roper v. United States*, 564 A.2d 726, 731 n. 9 (D.C.1989) (per curiam).

██ If this proposition is taken to its logical conclusion, however, then it is the defendant, and not the judge, who makes the decision whether there shall be one trial or two. As the court explained in *Baker v. United States*, 131 U.S.App.D.C. 7, 401 F.2d 958 (1968), *cert. denied*, 400 U.S. 965, 91 S.Ct. 367, 27 L.Ed.2d 384 (1970),

> unless the "election" referred to by appellant is to be regarded as conclusive—and we think it should not be—no need for a severance exists until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other. In making such a showing, it is essential that the defendant

present enough information—regarding the nature of the testimony he wishes to give on one count and his reasons for not wishing to testify on the other—to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of "economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying.

*Id.* at 25–26; 401 F.2d at 976–77 (footnotes omitted).

In the present case, the judge took seriously his obligation to weigh the potential prejudice to Ross from a joint trial against the countervailing considerations of judicial economy. Ross' proposed testimony regarding his encounter with Miller—defense counsel proffered that Ross would have admitted that the encounter occurred but would have denied threatening Miller [23]—would not have been altogether exculpatory, for Ross would have confirmed that the two men met and that they had discussed Miller's testimony, and he would thus have corroborated significant aspects of Miller's version of the event. The judge indicated his readiness to place reasonable restrictions on any cross-examination of Ross regarding the armed robbery, provided that this could be accomplished without unfairness to the prosecution. He exercised his discretion judiciously and did not abuse it.

## IV.

### CONCLUSION

For the foregoing reasons, we reverse Roy's convictions for armed robbery and PFCV and remand the case to the trial court with directions to enter a judgment of acquit-

---

21. At trial, Ross' defense appeared to be misidentification, notwithstanding the presence of his fingerprint on the pistol, his prompt apprehension, Miller's identification of him, and his prior acquaintance with Miller.

22. Even if we were of the opinion that Ross' motion for a severance was improperly denied—and we are not—then this would affect only Ross' obstruction of justice conviction. If the armed robbery (and related weapons counts) had been tried separately, the evidence of obstruction of justice would have been admissible to show consciousness of guilt. *Bowman v. United States*,

50 App.D.C. 90, 93, 267 F. 648, 651 (1920); *Payne v. United States*, 516 A.2d 484, 491–92 n. 14 (D.C.1986); *see also* II John H. Wigmore, Evidence, § 278, at 139–40 & n. 5 (Chadbourn ed.). Ross would not have testified at such a severed trial, and the proceedings against him would have been identical, in terms of the evidence presented, to those at his actual trial.

23. According to his attorney, Ross would have claimed that he asked Miller "why are you doing this to me," or words to that effect.

tal on each of these counts. We affirm Roy's CPWOL conviction and all of Ross' convictions.

*So ordered.*