**Sean CARTER and Rodney Tucker, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 06–CF–458, 06–CF–476.**

District of Columbia Court of Appeals.

Argued May 21, 2008.

Decided Sept. 18, 2008.

Nancy E. Allen, appointed by the court, for appellant Carter.

Glen Franklin Koontz, Martinsburg, WV, appointed by the court, for appellant Tucker.

Bernard J. Delia, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, and Roy W. McLeese III, Chrisellen R. Kolb, Elizabeth Trosman and Perham Gorji, Assistant United States Attorneys, were on the briefs, for appellee.

Before KRAMER and THOMPSON, Associate Judges, and STEADMAN, Senior Judge.

THOMPSON, Associate Judge:

Appellants Rodney Tucker and Sean Carter each were convicted of assault with intent to commit robbery while armed (AWIRWA), see D.C.Code §§ 22–401, – 4502; assault with a dangerous weapon (ADW), see D.C.Code § 22–402; two counts of possession of a firearm during a crime of violence or dangerous offense (PFCV) (one count based on the AWIRWA conviction, and the other based on the ADW conviction), in violation of D.C.Code § 22–4504(b); possession of an unregistered firearm (UF), in violation of D.C.Code § 7–2502.01; unlawful possession of ammunition (UA), in violation of D.C.Code § 7–2506.01(3); and carrying a pistol without a license (CPWL), in violation of D.C.Code § 22–4504(a). In addition, Carter was convicted of fleeing a law enforcement officer, see D.C.Code § 50–2201.05b (2005 Supp.). Both appellants argue that the evidence was insufficient to support their convictions. Carter argues in addition that his conviction should be reversed because he was prejudiced by the erroneous aiding and abetting instruction that the court gave to the jury and by the court's having permitted the jury to hear the tape of a 311 call that, he asserts, was more prejudicial than probative. Carter also argues (and the government agrees) that his convictions for AWIRWA and ADW should merge.

We agree that the AWIRWA and ADW convictions—for both Carter and Tucker— merge, and accordingly we remand to the trial court to vacate the ADW convictions and the PFCV convictions predicated on them. In all other respects, we affirm the judgments of conviction.

## I. Summary of the Facts

On August 20, 2005, Frank Young was walking in the 1200 block of Irving Street, N.E., carrying a bag of items that he had purchased at a farmer's market and wearing a pouch that contained his work credentials, credit cards and driver's license. The credentials, credit cards, and other items fell out of the pouch and onto the ground. A man who was walking behind Young, whom Young had never seen before but who was later identified as appellant Tucker, said, "you dropped something." Young turned around and retrieved his dropped items, thanked Tucker, and proceeded toward 13th Street, with Tucker following him. Young turned around and Tucker said, "Oh, what about me?" Tucker then reached into a pouch and pulled out a pistol. Young noticed that the pistol had a "smokey grayish type image around the barrel." Tucker's finger got caught in

the trigger housing and the weapon fired, pointing downward. Young ran to a nearby house, where he climbed a fence and hid for about five minutes.

Kevin Webb lived at 1235 Irving Street, N.E., and that afternoon, while standing in his driveway at the side of his house, he heard a gunshot. After the gunshot, Webb heard a voice say, "go man, go," and saw two cars, a black Maxima and a gray Mazda 626, drive by in opposite directions. Webb could not tell from which direction the voice had come. The Maxima headed west toward 12th Street and the Mazda headed east towards 13th Street. Webb could not see who was in the gray Mazda, which had previously been parked in front of the house belonging to Webb's next door neighbor, and which Webb had never seen on his block in the ten years he had lived there. Webb next saw an individual, later identified as Tucker, walk by, toward 13th Street, "right behind" the Mazda.

Webb's neighbor, James Fuqua, was on the back porch of his house at 1231 Irving Street, N.E., when he heard a gunshot. He went to the front of his house, looked out a front window, and saw a man, later identified as Tucker, walking toward 12th Street. He also saw a gray Mazda with "unusual" tinted windows parked in front of his house, which was "unusual." He explained that his block of Irving Street is "a quiet residential street, so usually it's either my neighbor or a neighbor across the street that's parked if there's anybody parked in front of my house." Fuqua heard someone who was "down the street towards 13th Street" yell, "go man, go." He saw the gray Mazda take off toward 13th Street and a black Maxima drive slowly toward 12th Street. "Right then,"

Fuqua testified, Tucker changed directions and "jogged back toward 13th Street."[1] Nobody else was on the sidewalk.

When Young returned to the street to get his bag, which he had dropped when he ran away from Tucker, he saw Tucker walking toward 12th Street. Tucker said to him, "if you know like I know you'll keep running." Once again, Young ran and hid.

Metropolitan Police Department (MPD) Officer James O'Gorman heard the "call for . . . a sound of gunshots" at 4:20 p.m., and he and his partner, Officer Page, immediately responded to the 1200 block of Irving Street. Young again emerged from hiding just as the police officers arrived, and he told the police that he had been robbed,[2] and that the assailant had a weapon, had run east down Irving Street and either turned south onto 13th Street or continued on Irving Street. Webb gave the police a description of the gray Mazda, telling them that it was a silver gray Mazda 626 with tinted windows. Detective Dexter Martin arrived and Young, Fuqua and Webb gave him similar descriptions of the man they had seen.

MPD Officer Matthew Miller and his partner, Officer Matthew Copsey, were on duty that afternoon in uniform and in a marked scout car when they heard a call go out for an armed robbery. At 4:28 p.m., they received a look-out for a black Maxima and a gray Mazda 626 with tinted windows. In the 1600 block of Mount Olivet Road, about two miles from the 1200 block of Irving Street, N.E., Officer Copsey pointed out a gray Mazda 626 with tinted windows. Officer Miller performed a U-turn and followed the gray Mazda for

---

1. Officer Nathaniel Covington testified that Fuqua told him that Tucker had been running down Irving Street toward 12th Street, and then ran back toward 13th Street.

2. Young found some of his missing items in the yard where he had been hiding and some items out on the sidewalk, and determined that nothing had been taken from his bags.

a couple of blocks, then pulled up beside it at a traffic light to get a better view of the occupants. When the light turned green, the Mazda pulled into the far left lane, turned left onto 26th Street, and then turned right into the Langston golf course parking lot. At that point, the officers activated their emergency lights and sirens, and the Mazda "proceeded to flee" through the parking lot, driving erratically and at a high rate of speed. The Mazda exited the parking lot onto Benning Road and, while attempting a left turn, collided with a large SUV.

Immediately as Officers Miller and Copsey pulled up to the Mazda, the driver, later identified as appellant Carter, jumped out of the driver's side door and began to run. Officer Copsey pursued Carter on foot and apprehended him a short distance away at about 4:35 p.m. Officer Copsey determined that Carter's address was on Clay Place, N.E., about six miles away from the 1200 block of Irving Street, N.E. Officer Miller testified that the Mazda's passenger, later identified as appellant Tucker, remained seated in the front by the door that had been hit by the SUV. Officer Miller, who was "at the [collided] vehicles" within a few seconds, walked around to the driver's side door with his weapon drawn and immediately saw a revolver to the left of the driver's seat. Officer Miller seized the weapon "[b]ecause it was accessible to the passenger in the vehicle." Miller placed handcuffs on Tucker and then extracted him from the vehicle through the driver's side door because the passenger side door had "significant damage to it" and Tucker was "blocked in." A few minutes later, Officer Copsey returned with Carter in custody.

Subsequently, Detective Martin brought Young to a show-up procedure where Young identified Tucker as the person who had drawn the gun on him. When shown the handgun recovered from the Mazda, Young said, "That's it. It was gray ... like that." Officers O'Gorman and Page took Webb to Benning Road where he identified the Mazda as the car he had seen earlier on his street. At a show-up identification, Fuqua identified Tucker as the person he had seen walking in front of his house, recognizing Tucker "instantly." Fuqua also identified a vehicle that police took him to see as the car that had been parked in front of his house, recognizing it because of the "distinctive window tint."

## II. Sufficiency of the Evidence

 In considering a claim of insufficiency of the evidence, we view the evidence "in the light most favorable to sustaining the conviction, ... giving deference to the [jury's] ability to weigh the evidence and make credibility and factual determinations," *Peery v. United States*, 849 A.2d 999, 1001 (D.C.2004) (citations omitted), and to "draw reasonable inferences from the testimony." *Dickerson v. United States*, 650 A.2d 680, 683 (D.C.1994) (citation omitted). To prevail on an insufficiency claim, an appellant must establish "that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt." *Peery*, 849 A.2d at 1001 (internal punctuation and citations omitted).

### A. Tucker's Claims

 Tucker argues that there was insufficient evidence to support his conviction for AWIRWA[3] and the related PFCV

---

**3.** The elements of assault with intent to commit robbery are: "1) that defendant assaulted complainant, and 2) at the time of the assault, 'the defendant acted with specific intent to

commit the offense of robbery upon the complainant.'" *Singleton v. United States*, 488 A.2d 1365, 1367 n. 2 (D.C.1985) (quoting Criminal Jury Instructions for the District of

conviction.[4] As to the AWIRWA conviction, he does not claim that the government failed to prove the elements of assault or failed to prove that he was armed, but he argues that the evidence was insufficient to prove that he "acted with specific intent to commit the offense of robbery upon the complainant." *Singleton, supra* note 3, 488 A.2d at 1367 n. 2. However, "[i]t is well established that the jury may infer the intent to rob from the 'totality of the evidence.'" *Id.* at 1367 (citations omitted); *see also Long v. United States,* 687 A.2d 1331, 1346 (D.C.1996) (holding that "intent to rob can be established when the government has presented facts that suffice as circumstantial evidence to warrant an inference of the intent of the robbery") (internal quotation marks and citation omitted). We have no trouble concluding that the evidence here was sufficient to permit the jury to conclude that Tucker assaulted Young with the intent to rob him. To be sure, as Tucker argues, there was no evidence that Tucker demanded that Young hand over his money, and no evidence that Tucker announced that he was performing a "stick-up." But an inference of intent to rob may be drawn "not only from the words uttered [ ] but also from [the] conduct." *Owens v. United States,* 497 A.2d 1086, 1090 (D.C.1985) (reasoning that "[t]here is no requirement that a defendant announce his intent"). Tucker's action of drawing a gun while uttering "what about me?" leaves little if any room for doubt that Tucker intended to put Young in apprehension of danger and thereby to force Young to give Tucker something of value.[5]

Because the evidence was sufficient to establish Tucker's intent to rob Young, and because Tucker does not challenge the sufficiency of the evidence with respect to his assaulting Mr. Young while in possession of a firearm, Tucker's challenge to the related PFCV conviction also fails. The assault with "intent to rob" made Tucker's offense a "crime of violence" within the meaning of D.C.Code §§ 22–4501(f) and –4504(b).

### B. Carter's Claims

 Carter challenges the sufficiency of the evidence as to all of his convictions except fleeing a law enforcement officer. We begin with Carter's challenge to his firearms convictions (UF, UA and CPWL).[6] We are satisfied that the evidence was sufficient for the jury to conclude that, when police caught up with Carter on Benning Road,[7] Carter had con-

---

Columbia, No. 4.13 (3d ed. 1978)). "While armed" requires proof that the defendant in addition was "armed with or [had] readily available any pistol or other firearm ... or other dangerous or deadly weapon...." D.C.Code § 22–4502(a).

4. "The elements of possession of a firearm during the commission of a crime of violence are: (1) possession of a pistol, machine gun, shotgun, rifle, or other real or imitation firearm, and (2) commission of a crime of violence as enumerated by the statute (not limited to assault with a dangerous weapon), while in possession of the firearm." *Freeman v. United States,* 600 A.2d 1070, 1073 (D.C. 1991).

5. Moreover, Young had never seen Tucker before, so there was no evidence to suggest any other motive for Tucker to pull a gun on Young.

6. Since Carter provided no argument in support of his challenge to these convictions, we "might treat [the challenge] as abandoned," but instead we consider it, since there is "no manifest prejudice" in doing so. *Roy v. United States,* 871 A.2d 498, 503–04 n. 2 (D.C. 2005).

7. The UF, UA and CPWL charges as they relate to the gun as used on Irving Street were based on an aiding and abetting theory rather than on a constructive possession theo-

structive possession of the gun and ammunition, *i.e.*, that he "knew [the contraband] was present ... and that he had both the ability and the intent to exercise dominion and control over it." *Rivas v. United States*, 783 A.2d 125, 129–30 (D.C.2001) (en banc) (citations omitted). First, the location of the gun next to where Carter had been sitting and the fact that the gun was immediately visible to Officer Miller when he walked toward the driver's side of the Mazda supported an inference that Carter knew the gun was there. Second, Carter's proximity to the gun supported an inference that he had the ability to exercise control over it. Third, although we have emphasized that a vehicle passenger's proximity to contraband in the vehicle is not enough to establish an intent to exercise control over it, *id.* at 130, we have reasoned repeatedly on facts similar to those here that an inference of constructive possession may be drawn against the *driver* of a vehicle in which contraband was found in plain view and in close proximity to the driver's seat.[8] And the possibility that Tucker, too, may have had the ability to exercise control over the gun in

the car—an inference that could be drawn from Officer Miller's testimony that he seized the gun to make it inaccessible to Tucker—does not undermine an inference that Carter had the requisite intent to control the gun. "Constructive possession may be sole or joint...." *Rivas*, 783 A.2d at 129 (citing *Parker v. United States*, 601 A.2d 45, 51–52 (D.C.1991)).

■ Carter's brief focuses primarily on his claim that there was insufficient evidence to support his conviction for aiding and abetting AWIRWA. At most, he contends, the evidence permitted the jury to conclude that he was an accessory after the fact.[9] We disagree.

■ By definition, an "aider and abettor" assists or participates in a crime while that crime is in progress. *Williams*, *supra* note 9, 478 A.2d at 1105. To prove aiding and abetting, the government must present evidence that: (1) a crime was committed by someone; (2) the accused participated in its commission; and (3) he or she did so with guilty knowledge. *Price v. United States*, 813 A.2d 169, 176 (D.C. 2002). By contrast, once the crime is com-

---

ry. We discuss Carter's challenge to his aiding and abetting convictions *infra*.

8. *See, e.g.*, *McGriff v. United States*, 705 A.2d 282, 290 (D.C.1997)("the evasive actions of the driver in response to the police, along with his proximity to the gun, was sufficient to prove constructive possession by the driver"); *see also Burwell v. United States*, 901 A.2d 763, 769 (D.C.2006) (reasoning that the "presence of marijuana on the tip of the automobile's lighter" and other circumstances "reinforce[d] ... the inference [of joint constructive possession] to be drawn from Burwell's control and operation of the car"); *Rivas*, 783 A.2d at 135 ("the jury could reasonably infer that Melgar, who was the owner and driver of the automobile and who was found with $236 in cash on his person, had control over its contents"); *Taylor v. United States*, 662 A.2d 1368, 1373 (D.C. 1995) ("It is usually easy to establish that

the owner of a car ... has constructive possession of illicit items recovered from [the car]"); *cf. Blackmon v. United States*, 835 A.2d 1070, 1075 (D.C.2003) ("because appellant was in the driver's seat, a fact from which a reasonable person might infer ownership of the car (or at least entitlement to drive it), there is a much stronger likelihood that he was at least in joint constructive possession of the cocaine" found on the floor of the car, supporting the determination that the police had probable cause to search the driver's jacket).

9. The government did not charge Carter with being an accessory after the fact, a crime that is "fundamentally dissimilar from that of a principal and must be distinctly charged in the indictment." (*McClinton*) *Williams v. United States*, 478 A.2d 1101, 1106 (D.C. 1984).

plete, one who knowingly "receives, relieves, comforts, or assists the felon in order to hinder the felon's apprehension, trial, or punishment" is an "accessory after the fact." *Williams, supra* note 9, 478 A.2d at 1105 (quotation marks and citation omitted). As we held in *Williams,* an individual who drives the getaway car for a robber is an "aider and abettor" to the robbery, not an "accessory after the fact," because he "acts as a principal in effecting a robbery by carrying away the proceeds of that robbery." *Id.* The fact that the robbery attempt failed (*i.e.,* that the principal committed only attempted robbery) does not affect the fact that the getaway-car driver acted with intent to aid and abet asportation.

■ There was sufficient evidence from which the jury could infer that Carter knowingly participated in the attempted armed robbery of Young by Tucker. The evidence, viewed in the light most favorable to the government, was that at the time of the incident, a gray Mazda with distinctive tinted windows, a vehicle that Webb and Fuqua had never seen before, was parked in the 1200 block of Irving Street in front of Fuqua's house; this was unusual, as no one other than residents usually parked on the block. After the gunshot was heard and reported, the gray Mazda pulled off toward 13th Street, and Tucker jogged toward 13th Street, "right behind" it. A short time later, Carter was seen driving the very same Mazda, with Tucker as a passenger, and the gun that Tucker used in the assault was found to the left of Carter's (driver's) seat. Before jogging off toward 13th Street, Tucker had been walking toward 12th Street, but changed directions when a voice called "go man go" from the direction of 13th Street, the direction in which the gray Mazda had driven at about the same time. When police began to follow the Mazda with their emergency signals activated, Carter began to drive erratically and at a high rate of speed, and when police caught up with the Mazda, Carter bolted from the car and ran. When police apprehended Carter, they learned that his address was six miles away from Irving Street. We think these facts permitted the jury to infer that Carter was in the gray Mazda when it was parked on Irving Street, that his business there was to wait for Tucker to commit an assault and robbery in order to whisk him away once the deed was done, that Tucker was looking for his get-away car and that Carter signaled Tucker about fleeing the scene (*i.e.,* that Carter was the one who yelled "go, man, go"[10]), that Carter tried to evade police out of consciousness of guilt,[11]

10. Carter asserts that the testimony was that "whoever yelled ['go man go'] was up the street from where [Fuqua] saw the gray Mazda." But, more accurately, Fuqua testified that "go man go" was yelled up the *street from where the gray Mazda had been parked when Fuqua first saw it.* Fuqua testified that the gray Mazda was parked in front of his house at the time when he looked out his front window right after hearing the gunshot. As Carter appears to acknowledge, the transcript is somewhat "confusing" as to sequence, but we think the testimony—including the testimony that "whoever it was that yelled go man go, both cars took off," with the gray Mazda taking off "towards 13th Street"—permitted the jury to infer that "go man go" was yelled simultaneously with (or even after) the Mazda's taking off "towards 13th Street."

11. While we have recognized that "it is a matter of common knowledge that men who are entirely innocent do sometimes fly from the scene of a crime through fear of being apprehended as the guilty parties, or from an unwillingness to appear as witnesses," (*John*) *Bailey v. United States,* 135 U.S.App.D.C. 95, 100, 416 F.2d 1110, 1115 (1969) (quotation marks and citation omitted), it nevertheless is "well-settled in this jurisdiction that evidence of flight ... can be admitted at trial as evidence of consciousness of guilt." (*Curtis*)

that the gun found to the left of the driver's seat was the one used in the assault and that it belonged to Carter,[12] and therefore that Carter furnished it to Tucker to enable him to carry out the crime.[13] Though perhaps "not overwhelming," *Wesley v. United States*, 547 A.2d 1022, 1027 (D.C.1988), the evidence supported an inference that, from beginning to end, Carter participated in the crime "as something he wanted to bring about," and took actions in an effort to make it succeed. *Price*, 813 A.2d at 176.

The gaps in direct evidence on which Tucker relies—that no one identified Carter as having been on Irving Street, that no one saw Tucker and Carter together before or during the assault, that no one saw Tucker exit the Mazda before the assault, and that the gun carried by Tucker had been concealed in a pouch and therefore had not been visible to Carter—mean, we accept, that the jury was not compelled to find that Carter aided and abetted Tucker's crimes. But, in totality, the evidence was sufficient to permit the jury so to find. "The evidence need not compel a finding of guilt or negate every possible inference of innocence." *Garcia v. United States*, 897 A.2d 796, 800 (D.C. 2006) (quotation marks and citation omitted); *see also United States v. Salamanca*, 300 U.S.App.D.C. 384, 390, 990 F.2d 629, 635 (1993) (a jury "may permissibly draw a vast range of inferences from evidence" and "the government's evidence need not exclude all reasonable hypotheses of innocence or lead inexorably to the conclusion that the defendant is guilty") (quotation marks and citations omitted).

Carter cites us to a number of cases in which this court reversed convictions for aiding and abetting upon application of the principle that "[p]roof of an accused's presence at the scene of a crime alone cannot support a conviction of aiding and abetting the commission of a crime." *Quarles v. United States*, 308 A.2d 773, 774 (D.C. 1973). But this case is readily distinguishable. Shortly after the assault, Carter was found with Tucker in the gray Mazda with the gun used in the assault next to his (Carter's) seat. Thus, unlike *Quarles*, this is not a case in which the defendants, never seen together before the crime, also were not "connected in any other way," *id.*, and unlike *In re R.A.B.*, 399 A.2d 81 (D.C. 1979), and *In re L.A.V.*, 578 A.2d 708 (D.C.1990), this is not a case in which there was "proof of the presence of an accused at the scene of a crime ... without more...." *R.A.B.*, 399 A.2d at 83. Unlike *Roy v. United States*, 652 A.2d 1098 (D.C.1995), this is not a case in which

Smith *v. United States*, 777 A.2d 801, 807 (D.C.2001).

**12.** Tucker's inept handling of the gun may also support this inference.

**13.** Carter argues that the evidence made it "far more likely that Mr. Tucker, knowing that he had just tried to rob someone, handed the gun off to Mr. Carter after the fact to get it out of his possession, to wash his hands of it *should the police pull the car over*." We think that explanation "strain[s] credulity," *Kitt v. United States*, 904 A.2d 348, 356 (D.C. 2006), particularly because Carter's reaction upon seeing the police in pursuit makes it unlikely that he would have been content to

be the one harboring a gun with which he had no connection in the event that police pulled the car over. It also seems unlikely that Tucker, sitting on the passenger side of the Mazda that was hit so forcefully that he was "blocked in," would have had the presence of mind or time to place the gun to the left of the driver's seat during the "few seconds" that it took Officer Miller to get to the Mazda after the collision. Officer Miller testified that Tucker "remained in the vehicle" during that interval, that he "stayed with" Tucker, and that Tucker "was still in the [passenger] seat" when Carter exited the vehicle, without mentioning any movement by Tucker.

the principal's decision to rob the victim "appears to have been improvised at the last moment, and not planned in advance," *id.* at 1104, or where the facts are "just as consistent with the hypothesis that" Carter knew nothing about Tucker's intent to rob as they are with the alternative hypothesis that Carter waited on Irving Street for Tucker to carry out that intent. *Id.* Unlike *Clark v. United States,* 418 A.2d 1059 (D.C.1980), this case is not one in which appellant, who picked up the principal assailant in his car, "immediately stopped" and made "no attempt to avoid Officer[s]" when the police officers activated their emergency equipment, supporting an inference that appellant did not know that the principal had committed an (attempted) robbery. *Id.* at 1060. Unlike *Salamanca,* 300 U.S.App.D.C. 384, 990 F.2d 629, and *United States v. Teffera,* 300 U.S.App.D.C. 23, 985 F.2d 1082, 1086 (1993), this is not a case in which there was evidence that appellant was at the crime scene for a purpose other than the commission of the charged crime, or where (as in *Teffera*) appellant was never found in constructive possession of the contraband.

Nor is this case on all fours with *Goodwin v. United States,* 121 U.S.App.D.C. 9, 347 F.2d 793 (1965), where appellant was found an hour after the robbery in a different section of the city, riding as a rear-seat passenger in a car with the three identified assailants; as the court recognized in *(Barry) Bailey v. United States,* 128 U.S.App.D.C. 354, 389 F.2d 305 (1967), the fact that an appellant "was the driver, and not a passenger in the back seat [as in *Goodwin*] makes his presence more consistent with his being a lookout than with his being an innocent passenger who joined the others after the crime was committed." *Id.* at 359, 389 F.2d at 310. Here, shortly after the assault on Young, Carter was found driving a vehicle which was seen at the crime scene (and having no apparent connection to the residential street on which it was parked) and which appellant Tucker jogged "right behind." The evidence permitted the jury to infer that Carter yelled "go man go," setting Tucker straight as to which direction to walk to catch up with his get-away vehicle. Here, there was not only sufficient evidence of Carter's presence at the crime scene, but also sufficient evidence that Carter's presence "designedly encourage[d] the perpetrator [and] facilitate[d] the unlawful deed. . . ." *(John) Bailey, supra* note 11, 135 U.S.App.D.C. at 98–99, 416 F.2d at 1113–14.

### III. The Aiding and Abetting Instruction

■ As an additional basis for challenging his conviction for aiding and abetting AWIRWA, Carter argues that his conviction should be reversed because the trial court gave the jury an aiding and abetting instruction that this court has held is legally erroneous. The court instructed the jury that "[a]n aider and abettor is legally responsible for the acts . . . of the other persons that are the natural and probable consequences of the crime in which he intentionally participates." However, this court has since held that "where a specific *mens rea* is an element of a criminal offense, a defendant [tried as an aider and abettor] must have had that *mens rea* himself to be guilty of that offense. . . ." *Kitt, supra* note 13, 904 A.2d at 356 (D.C.2006) (citing *Wilson–Bey v. United States,* 903 A.2d 818 (D.C.2006) (en banc)). And in *Walters v. United States,* 940 A.2d 101 (D.C.2007), we confirmed that "the *Wilson–Bey* holding applies equally to the crimes of robbery and assault with intent to rob. . . ." *Id.* at 102.

The government concedes that the "natural and probable consequences" instruction that the court gave was erroneous, but

argues that reversal is not required because Carter waived the objection he now makes—meaning that our review may only be for "plain error"—and because the error, though plain at the time of appellate review, did not affect Carter's substantial rights. We agree.

 Carter objected to the court's giving an aiding and abetting instruction on the ground that there was no evidence that Carter had foreknowledge that Tucker intended to commit an offense. However, as he acknowledges in his supplemental brief, he "did not object to the Court's giving the portion of the aiding and abetting instruction that included [the] 'natural and probable consequences' language." Indeed, Carter's counsel told the court, "Your Honor, we're not objecting to that last paragraph." Because Carter did not object to the "natural and probable consequences" instruction, we review his claim under the demanding plain-error standard. *See Baker v. United States*, 867 A.2d 988, 1003 (D.C.2005) (citing *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). On plain-error review, "an appellant must show that the objectionable action was (1) error, (2) that is plain, (3) that affects substantial rights, and (4) that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Coleman v. United States*, 948 A.2d 534, 544 (D.C.2008) (quotation marks and citation omitted). Applying that standard, we conclude, as we go on to explain, that the instructional error did not affect Carter's substantial rights, because we see little likelihood that the jury convicted Carter of AWIRWA without finding that he had the requisite mens rea.[14]

The jury specifically found that Carter was guilty of CPWL, UF and UA "based on the (12th & Irving Street) events." Presumably, those convictions were not based on a theory of constructive possession. As the prosecutor acknowledged, there was no evidence to support a theory that Carter constructively possessed the gun and ammunition on Irving Street; Carter was not near the gun (Fuqua testified that "[n]obody else was on the sidewalk" with Tucker) and presumably had no ability to exercise control over the gun.[15] Therefore, we see little or no likelihood that the jury convicted Carter of aiding and abetting AWIRWA on the basis of his having participated with Tucker in (jointly) possessing the gun while on Irving Street.

In all likelihood, Carter's CPWL, UF, and UA convictions were based on an aiding and abetting theory—specifically, on the theory that Carter aided and abetted Tucker to carry and possess the gun and ammunition on Irving Street. As discussed *supra*, the evidence permitted an inference that the gun and ammunition belonged to Carter, and that he furnished them to Tucker to carry on Irving Street while Carter waited in the gray Mazda. If—as seems likely—that is the inference the jury drew, we think they also would have concluded that Carter shared Tucker's intent to commit a robbery, even if they had never heard the "natural and probable consequences instruction." That is because the evidence suggests no other reason why Tucker or Carter would have wanted Tucker to be armed on Irving Street while Carter waited in the Mazda. For these reasons, we think it likely that the jury concluded that Carter had the mens rea required to convict a defendant of AWIRWA. Thus, we are not persuaded

---

14. "*[M]ens rea* may be inferable from the facts and circumstances...." *Kitt, supra* note 13, 904 A.2d at 353.

15. Similarly, there was no evidence that Carter was in actual possession of the gun and ammunition on Irving Street.

by Carter's argument that without the "natural and probable consequences" instruction, Carter would not have been convicted of AWIRWA and of the PFCV count predicated on that offense; rather, we think the government is correct that "[a]ny impartial trier of fact who credited the prosecution's evidence would ... be bound to conclude that ... appellant Carter acted with the specific intent to rob Frank Young" while (Tucker was) armed.

Moreover, Carter was not precluded from presenting his case to the jury (*e.g.*, by providing testimony to persuade the jury that the inferences that the government asked them to draw—that he was present on Irving Street, that he knew that Tucker was armed, and that he participated in Tucker's actions as something he wanted to bring about—were unwarranted). Thus, the instructional error did not "seriously affect[ ] the fairness, integrity or public reputation of [the] judicial proceedings," *Kidd v. United States*, 940 A.2d 118, 128 (D.C.2007) (quotation marks and citation omitted), and we are satisfied that no miscarriage of justice will result from letting Carter's conviction stand.

## IV. The 311 Tape

■ Carter's next argument is that the trial court erred in allowing the jury to hear the tape of the 311 call that Fuqua made to police to report the gunshot he heard, a tape in which Fuqua stated that "they drove off." Carter contends that the court failed to balance the prejudicial effect of the tape against its probative value.

The tape had been played for the jury during trial over Carter's hearsay objections. Thereafter, when the parties' coun-

sel were compiling exhibits to be made available to the jury during deliberations, Carter's counsel asserted for the first time that Fuqua's statement that "*they* drove away" (italics added) was not supported by the evidence at trial (because Fuqua did not see who was in the gray Mazda as it pulled off, and did not see Tucker enter the vehicle at any time), and therefore was more prejudicial than probative. Pointing out that the tape had been admissible not for the truth of the matters asserted during the call, but to show why police followed the Mazda, the court ruled that Carter's new objection came too late.[16]

■ Ordinarily, we review a trial court's rulings on the admissibility of evidence for abuse of discretion. *See, e.g., Kidd v. United States*, 940 A.2d at 129, (the admissibility of evidence "is committed to the sound discretion of the trial court[,] and this court will not disturb its ruling absent an abuse of discretion") (quotation marks and citation omitted). Here, however, because Carter failed to raise any objection during the trial concerning the error he alleged after the jury had retired for deliberations,[17] we agree with the government that the court's ruling should be reviewed only for plain error.

We need not address whether the court erroneously failed to weigh any prejudicial effect of the 311 tape against its probative value, because we are satisfied that even if there was error, it did not affect Carter's substantial rights. *See Arnold v. United States*, 358 A.2d 335, 342 (D.C.1976) (reasoning that error did not affect defendant's substantial rights where there were "other factors in the case which show that the defendant ha[d] been given a fair trial")

16. *Cf. Salzman v. United States*, 131 U.S.App. D.C. 393, 396, 405 F.2d 358, 361 (1968) (hearsay objection made during jury deliberations when testimony was read back to the jury came "too late").

17. As the government points out, Carter also failed to cross-examine Fuqua about the misstatement on the 311 tape.

(quotation marks and citation omitted). Fuqua acknowledged during his testimony on direct that while he said on the call that "[t]here's some guys that took off down 13th street," he "didn't actually see [Tucker] turn on to 13th Street." The jury also heard Webb's testimony that the gray Mazda drove past him toward 13th Street while Tucker "then ... came right behind," walking. Thus, the sworn testimony contradicted Fuqua's statement on the tape that "they" drove away, and we think it unlikely that Fuqua's use of the word "they" on the tape swayed the jury in arriving at its verdict about whether Carter was involved with Tucker in the incident on Irving Street.[18]

### V. Merger of the AWIRWA and ADW Convictions

Carter argued for the first time in his supplemental brief that the crimes of AWIRWA and ADW merge, and that his conviction of ADW and the PFCV conviction associated with it should be vacated. *See* (Frederick) *Williams v. United States,* 641 A.2d 479, 483 (D.C.1994) (citing *United States v. Alston,* 157 U.S.App.D.C. 261, 263, 483 F.2d 1264, 1266 (1973)). The government has agreed, and accordingly we will remand to the trial court to vacate Carter's ADW conviction and his associated PFCV conviction.

▪▪▪▪ Tucker has not raised the merger issue, and the government's briefs do not address merger as to Tucker. However, we think it appropriate to raise the issue *sua sponte* and to order remand in Tucker's case as well for the court to vacate his ADW and associated PFCV conviction.[19] *See Morris v. United States,* 622 A.2d 1116, 1129 (D.C.1993) ("On appeal, neither appellant nor the government addresses the question of whether, once the conviction for assault with a dangerous weapon merges with the conviction for attempted armed robbery, appellant's conviction for possession of a firearm during a crime of violence or dangerous offense (assault with a dangerous weapon) merges with his conviction for possession of a firearm during a crime of violence or dangerous offense (attempted armed robbery). Nevertheless, we hold that these two convictions merge because they concern violations of the same statute ... by the same actions (placing a gun against Mr. Flythe's stomach and demanding his money), and there is no indication that the legislature intended to allow multiple sentences in such circumstances" (citation omitted)); *see also Bean v. United States,* 576 A.2d 187 (D.C.1990) ("Although we find no merit in any of the issues raised by Bean in his appeal, we do find merit in an issue raised *sua sponte* by this court: that Bean's conduct constituted a single violation of the

---

**18.** Moreover, the jurors doubtless were familiar with the practice of using "they" as a singular (rather than plural) pronoun when the speaker does not know the gender of the person being spoken of—*i.e.,* what WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY refers to as the usage of "they" to mean "he" or "she" in conjunction with an "indefinite singular antecedent."

**19.** This disposition seems appropriate since Tucker did not forfeit the right to challenge his illegal sentence by not raising it in this appeal. An illegal sentence—including a sentence for a conviction that should have

merged with another conviction to avoid a double jeopardy violation—may be challenged at any time. *See Brown v. United States,* 795 A.2d 56, 63 (D.C.2002) ("a motion to correct an illegal sentence should be considered without regard to cause and prejudice requirements. In the present case, therefore, Brown's failure to raise his double jeopardy challenge to the legality of his sentence at the time of his sentencing or on direct appeal does not bar our consideration of his claim on its merits"); *see also* Super. Ct. Crim. R. 35(a) ("The Court may correct an illegal sentence at any time....").

statute and, thus, he may only be sentenced on a single count. We remand with instructions to vacate one of the two convictions . . . .").

## VI. Conclusion

For the foregoing reasons, we remand to the trial court to vacate appellants' convictions for ADW as well as their convictions for PFCV premised on the ADW convictions. In all other respects, we affirm.

*So ordered.*