*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

Nos. 12-CF-802 & 12-CF-925

DeAngelo Coderro Terry & Billy A. Robin, Appellants,

v.

United States, Appellee.

Appeals from the Superior Court of the
District of Columbia
(CF2-11468-09 & CF2-11466-09)

(Hon. Ann O'Regan Keary, Trial Judge)

(Argued February 19, 2014          Second Amended Opinion June 5, 2015)[*]

*Jonathan S. Zucker*, with whom *Patricia Daus* was on the brief, for appellant DeAngelo Coderro Terry.

*Benjamin Brooks* for appellant Billy A. Robin.

*David P. Saybolt*, Assistant United States Attorney, with whom *Ronald C. Machen Jr*, United States Attorney at the time the brief was filed, and *Elizabeth*

---

[*] This opinion is amended to revise footnote 10 on page 48 of the first amended opinion issued on May 11, 2015, and to make a non-substantive correction. The matter was initially decided on April 30, 2015, and the original opinion was issued on that date. Both the April 30, 2015, and the May 11, 2015, versions of this opinion have been withdrawn by order of the court, issued on June 5, 2015, and both have been replaced by the opinion herein.

*Trosman*, *John P. Mannarino*, *Maia Luckner Miller*, and *Suzanne Clement Libby*, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, *Chief Judge*, FISHER, *Associate Judge*, and RUIZ, *Senior Judge*.

WASHINGTON, *Chief Judge*: Appellants DeAngelo Coderro Terry ("Terry") and Billy A. Robin ("Robin") appeal from their convictions for four counts of aggravated assault while armed ("AAWA").[1] Terry also appeals from his convictions for four counts of possession of a firearm during a crime of violence ("PFCV").[2] Appellants' convictions stem from a shooting that occurred on May

---

[1] D.C. Code §§ 22-404.01, -4502 (2012 Repl.). Both appellants were additionally charged with conspiracy (D.C. Code § 22-1805a (2012 Repl.)), four counts of assault with intent to kill while armed ("AWIKWA") (D.C. Code §§ 22-405, -4502 (2012 Repl.)), and eight corresponding counts of possession of a firearm during a crime of violence ("PFCV") (D.C. Code § 22-4504 (b) (2012 Repl.)). The jury was unable to reach a verdict on the conspiracy count and the AWIKWA and PFCV counts as to victim Wingard.

[2] D.C. Code § 22-4504 (b) (2012 Repl.). Terry was additionally charged with and convicted of unlawful possession of a firearm ("UF") (D.C. Code § 22-4503 (a)(1) (2012 Repl.)) and carrying a pistol without a license ("CPWL") (D.C. Code § 22-4504 (a) (2012 Repl.)). The jury acquitted Terry of the other three AWIKWA and corresponding PFCV counts (as to Washington, Williams, and Clipper). Robin was additionally charged with and convicted of unauthorized use of a vehicle ("UUV") (D.C. Code § 22-3215 (2012 Repl.)), and fleeing a law enforcement officer (D.C. Code § 50-2201.01 (2012 Repl.)), and he pleaded guilty to offenses committed during release (D.C. Code § 23-1328 (a)(1) (2012 Repl.)) at the beginning of trial. At trial, the government dismissed three of Robin's AWIKWA and corresponding PFCV counts (as to Washington, Williams, and Clipper). The jury was unable to reach a verdict as to Robin's PFCV count for AAWA (as to Wingard), such that Robin was not convicted of any PFCV counts.

19, 2009, around 4:30 p.m., on North Capitol Street in Northwest Washington, D.C., during which Jameeka Washington ("Washington"), Chaquon Wingard ("Kwame Wingard"), Antione Clipper ("Clipper"), and Tyrique Williams ("Williams") were shot. Both appellants argue that there is insufficient evidence to support the "serious bodily injury" element of two of their AAWA convictions (with respect to victims Clipper and Williams) and contend that they were prejudiced by the government's suppression of *Brady* material that was not turned over until the beginning of trial. Both appellants also argue that the trial court abused its discretion in admitting two specific pieces of testimony, the probative value of which was substantially outweighed by the danger of unfair prejudice. Separately, Robin contends that there was insufficient evidence to support the "intent" element for all four of his AAWA convictions, to the extent that he was convicted under an accomplice liability theory, and he also argues that certain inculpatory statements that Terry made to the government's cooperating witness were improperly admitted against him. Finally, Terry argues that his four convictions for PFCV should merge into one. We affirm in part and remand in part.

## I.  Facts

On May 19, 2009, around 4:00 p.m., victims Washington, Wingard, Clipper,

and Williams were standing with a group of friends on North Capitol Street between R Street and Randolph Place, N.W.   Shortly after 4:00 p.m., Clipper crossed North Capitol Street to go to the liquor store on the southeast corner of North Capitol and R Streets.   When he exited the store, he saw Wingard standing in front of a carryout store on the northeast corner of North Capitol and R Streets.   He observed Terry, driving a gray Camry with two or three other passengers, go north on North Capitol Street, turn right onto R Street, where Wingard was standing, and stop at the light on Lincoln Road, close to the carryout.   Clipper saw Wingard staring at the car.   Both men then returned to their group.

Shortly thereafter, a tan Explorer driving south on North Capitol Street, which contained two males and two females, passed the group.   One of the females, "Rakiya," stuck her head out the window, said "fuck you[,] Jameeka," and gave her the finger.   Washington laughed it off, explaining at trial that she and Rakiya had previously been in fist-fights over a boy named Quinton, but that she had not seen Rakiya in a year and did not think they were still in a fight.

At approximately 4:20 p.m., a black male walked southbound on North Capitol Street toward Washington's group.   He pulled a black ski mask over his face with one hand as he walked, and raised a gun with his other.   When the shooter

was about fifty feet from the group, he fired a volley of about ten shots. Clipper was hit in the leg but was able to hop to the median strip in North Capitol Street where he collapsed. Another member of the group arched his back as though he was hit. The shooter then took several "deliberate" steps toward the group and fired a second volley of shots.[3] When he was finished, the shooter ran back toward Randolph Place.

Washington was talking on her cell phone when the first volley of shots was fired. She returned to her conversation, heard more "pops," then turned around and saw everyone running away. Washington ran towards her car on R Street to get away, but was shot four times—in the chest, wrist, and ankle. Wingard, who was near Washington, tried to move both of them out of the shooter's way. Wingard was shot three times in the forehead. After the shooting, Washington collapsed near Wingard in front of the church on the northwest corner of North Capitol and R Streets. Clipper had collapsed in the median; he had been shot in the left shin and the left foot, and the bullet to his left shin had broken his fibula or tibia.[4] Williams collapsed in front of the carryout with two gunshot wounds to his left forearm and

---

[3] Four eyewitnesses described hearing two separate sets of shots with a pause in between. Only Clipper did not think there was a break in the shots.

[4] It is unclear from the transcript which bone was broken.

two to his chest, near his collarbone. Fifteen 9 mm shell casings, all fired from the same gun, were later recovered from the scene.

Three Metropolitan Police Department ("MPD") officers, Francisco Montano, Christopher Cartwright, and Brian Hollan, were executing a search warrant in an unrelated matter one block north of the scene when they heard the gunshots on North Capitol Street. Officer Montano ran out and saw Ronald Taylor, who was napping in his truck on Randolph Place, when the shooting occurred, pointing "hysterically" at a red van that was heading west down Randolph Place towards First Street, N.W. Taylor told Officer Montano that the van had just been involved in the shooting. Meanwhile, Officers Cartwright and Hollan arrived in an unmarked police car while the van was still on the block and a chase ensued. The van turned right onto First Street heading north, and though the officers turned on their emergency equipment, the van did not stop. The chase continued for twenty to twenty-five minutes, and ultimately involved over twenty police cars. During the chase, the police lost sight of the van for a matter of seconds when it went behind the attendant's booth at a Chevron gas station at 6250 Belcrest Road in Maryland. Police described the van as driving recklessly, at highway speeds through residential streets, sometimes driving into oncoming traffic.

When the van finally crashed into several parked cars in Hyattsville, Maryland, police found appellant Robin in the driver's seat, Terry in the passenger seat, and co-defendant Deandre Banks ("Banks")[5] in the backseat. As police pulled Robin from the car, Robin tossed a black knit ski mask under the van. DNA analysis revealed that there was genetic material from three or more individuals on the ski mask, and Robin and Terry could not be excluded as the source of that material—a random match probability for both men was one out of 25,000 in the African-American community. The van was a stolen Dodge Caravan. After the three men were arrested, police recovered a second black knit ski mask and hat, as well as a black silk hat, from behind the attendant's booth at the Chevron gas station. DNA analysis of the black knit hat and ski mask matched Terry, and DNA on the black silk hat matched Banks. Police never recovered the gun used in the shooting.

Police photographed Terry, Robin, and Banks to document what each was wearing that day. All three photographs were presented as exhibits at trial. Terry was wearing a black T-shirt and light blue jeans. Terry's blue jeans had a pattern embroidered on the seat. Terry was a 5'11" tall, medium-complected black male with shoulder-length dreadlocks or braids and a light mustache. Robin was

---

[5] Banks was tried jointly with Terry and Robin, but the jury hung as to all counts against him.

wearing a green long-sleeved dress shirt and had a bandage on his face. He was a black male with a medium complexion, a stocky build, short hair, and a mustache. Banks was wearing a black T-shirt with white writing that was turned inside out, and dark jeans. Banks was 6'3" tall with short hair, a short beard, and a mustache. He was also a black male with a medium complexion.

At trial, victims Washington, Wingard, and Clipper testified about the shooting and the injuries they suffered. Williams did not testify, though the government called the physician who treated him at the hospital to testify to the extent of his injuries. The jury also heard testimony from several officers involved in the car chase, four eyewitnesses to the shooting, a cooperating government witness, Keith Daniels ("Daniels"), to whom Terry had allegedly made inculpatory statements in the days after the shooting, and two defense witnesses called to impeach Daniels' testimony. The government also presented physical evidence in the form of the DNA analyses that linked Terry, Robin, and Banks to the ski masks and black hat in the van.

In particular, Daniels, who was Terry's next door neighbor, testified that several days after the shooting Terry came over to his house and told him, in the presence of his nephews, that not only had he been involved in the shooting, but also

why he thought he might get away with it. Daniels was impeached with a cooperation agreement that he entered into in this case, his prior convictions for three different assaults, including AWIKWA, and his admission to having previously cooperated with the government in another homicide case involving Curtis Bunn, a witness for the defense, in this case.

## II. Sufficiency of the Evidence

## A. Sufficiency of the Evidence with Respect to Robin's AAWA Convictions as an Aider and Abettor

This court has previously clarified that in order to prove a defendant guilty of AAWA under an aiding and abetting theory, the government must prove beyond a reasonable doubt that the defendant had the requisite *mens rea* to commit the crime.

> [W]hen the government prosecutes a defendant under an aiding and abetting theory of criminal liability, in addition to proving that the aider and abettor "participated" in the assault, the government must prove also that the aider and abettor himself intended to cause serious bodily injury or acted with extreme indifference to human life because he knew either that the principal would commit an assault with such intent, or that the principal would intentionally engage in an assaultive act that actually created a grave risk of serious bodily injury.

*Perry v. United States*, 36 A.3d 799, 817 (D.C. 2011).

This court has dealt with the issue of whether there was sufficient evidence from which a jury could conclude that a defendant had the requisite intent to have "aided and abetted" the principal perpetrator of a crime on several occasions. For example, we have found insufficient evidence to convict a defendant as an aider and abettor after the defendant testified that he did not know that the principal had just committed a robbery when there was evidence that after he picked the principal up in his car, the defendant drove away at a normal speed, pulled over when the police signaled, and cooperated with police. *See Clark v. United States*, 418 A.2d 1059, 1061-62 (D.C. 1980). We also held that there was insufficient evidence to convict the defendant as an aider and abettor in *Quarles v. United States*, 308 A.2d 773, 774 (D.C. 1973), where the defendant was present on a bus when the principal committed petit larceny, remained on the bus after the theft to cooperate with police, and was not found to have the victim's wallet on his person. In *Quarles*, there was also no evidence of any communication or connection between the defendant and the thief—they were never seen together before the theft or connected in any other way. 308 A.2d at 775.

On the other hand, this court found that there was sufficient evidence from which a reasonable juror could convict the defendant of aiding and abetting an

armed robbery in *Carter v. United States*, 957 A.2d 9 (D.C. 2008). In that case, the evidence showed that at the time of the incident, a gray Mazda with distinctive tinted windows was parked on the street, which neighbors found unusual as generally only residents parked on the block and they had never seen the car before. 957 A.2d at 9. A gunshot went off, the gray Mazda pulled away, and a voice from the direction of the vehicle was heard saying, "Go man go." *Id.* The shooter jogged in the same direction behind the Mazda, and a short time later, Carter was seen driving the Mazda with the shooter as a passenger. *Id.* When police began to pursue the car, Carter began driving erratically and at a high rate of speed, and when the police finally caught up with the Mazda, Carter fled the vehicle before being apprehended. *Id.* The gun that the shooter used in the assault was found to the left of Carter's (driver's) seat. *Id.*

Although the evidence was "not overwhelming," this court concluded that it was sufficient to support an inference that Carter participated in the crime from beginning to end and took actions in an effort to make it succeed. *Id.* at 18. Specifically, the court determined that a jury could reasonably infer: (1) that Carter was in the gray Mazda while it was parked on the street; (2) that his intention was to wait for Tucker to commit an assault and robbery and then drive him away once the act was complete; (3) that Carter signaled to Tucker about fleeing (the voice saying

"Go man go"); (4) that Carter tried to evade the police out of consciousness of guilt; (5) that the gun found to the left of the driver's seat was used in the assault and that it belonged to Carter; and (6) that Carter supplied Tucker with the gun to help him carry out the crime. *Id.* at 17-18.

Here, like in *Carter*, we are satisfied that the evidence supports an inference that Robin participated in the crime from the beginning and took steps to make it succeed. First, the jury could reasonably infer that Robin was waiting in the van with an intention to drive Terry away after the successful completion of the crime based on the fact that he was sitting in a stolen van in the vicinity at the time of the shooting. Unlike in *Quarles*, Robin and Terry were known to be connected, as evidenced by the fact that the two men were seen together on the morning of the shooting. Additionally, unlike in *Clark* and *Quarles*, here the jury could reasonably infer that Robin intended to aid Terry in the successful completion of the assault because rather than cooperating with police, Robin led over twenty police cars on a dangerous, high-speed chase that lasted over twenty minutes. Finally, the jury could reasonably infer that Robin's attempt to dispose of the extra ski masks and hats (at least one of which featured Robin's DNA) was evidence that the men were involved in the crime together from the outset. Because these are reasonable inferences that can be drawn from the evidence presented in this case, we are

satisfied that sufficient evidence was presented that Robin possessed the requisite *mens rea* to sustain his conviction as an aider and abettor.

### B. Sufficiency of the Evidence of Serious Injury with Respect to Appellants' AAWA Convictions

Both Terry and Robin argue that there was insufficient evidence to permit a reasonable trier of fact to find that victims Clipper and Williams suffered serious bodily injuries, an essential element of AAWA. *See, e.g.*, *Riddick v. United States*, 806 A.2d 631, 639 (D.C. 2002). We review a challenge for sufficiency of the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, and making no distinction between direct and circumstantial evidence." *Gathy v. United States*, 754 A.2d 912, 917 (D.C. 2000) (citations and internal quotation marks omitted). Thus, "[i]t is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury." *Id.* (citations and internal quotation marks omitted).

This court has defined "serious bodily injury" as an "injury that involves a

substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or loss or impairment of a bodily member or function." *Jackson v. United States*, 970 A.2d 277, 279 (D.C. 2009) (citations omitted); *Bolanos v. United States*, 938 A.2d 672, 677 (D.C. 2007). This court has recognized "the high threshold of injury" that "the legislature intended in fashioning a crime that increases twenty-fold the maximum prison term for simple assault." *Bolanos*, 938 A.2d at 677-78 (quoting *Swinton v. United States*, 902 A.2d 772, 775 (D.C. 2006) (internal citation omitted)). While "injuries such as knife or gunshot wounds are not *per se* serious bodily injury," *Scott v. United States*, 954 A.2d 1037, 1046 (D.C. 2008) (citations and internal quotation marks omitted), the jury can use evidence of such injuries plus other evidence to infer that the victim suffered "serious bodily injury." *See, e.g.*, *Jenkins v. United States*, 877 A.2d 1062, 1071 (D.C. 2005) (sufficient evidence from which jury could find that victim suffered "serious bodily injury" where victim sustained multiple deep stab wounds to the chest, stomach, and arms, inflicted with a seven- or eight-inch blade).

## C. Extreme Physical Pain: Clipper and Williams

The level of extreme physical pain necessary for a jury to find that a victim suffered serious bodily injury "must be exceptionally severe if not unbearable."

*Swinton*, 902 A.2d at 777. There is no requirement that a victim testify to having experienced extreme pain for a jury to so find; rather, the important consideration is whether "a reasonable juror may be able to infer that pain was extreme from the nature of the injuries and the victim's reaction to them." *Bolanos*, 938 A.2d at 681 (citations omitted). Thus, we have held that there was sufficient evidence for the jury to conclude that a stabbing victim suffered extreme pain where: (1) the victim described that she had "felt the knife, that [i]t was burning . . . [i]t was *very painful*"; (2) testimony from her physician indicated that she was in pain when she came to the hospital, that the pain was "significant," and that the injury required immediate surgery because "the knife had gone through [her] kidney"; (3) the surgery resulted in a six- to eleven-inch scar on the victim's stomach; and (4) due to complications resulting from the first surgery, the victim was required to undergo a second surgery. *See Anderson v. United States*, 857 A.2d 451, 464 (D.C. 2004). On the other hand, we have held that there was insufficient evidence for a jury to conclude that the victim suffered extreme pain where the victim "stood in place for a while after he was shot, did not undergo surgery in connection with his injury, and was able to travel to El Salvador five days after the shooting." *Castillo-Campos v. United States*, 987 A.2d 476, 487 (D.C. 2010).

This court distinguished between situations in which there was sufficient

evidence from which a jury could conclude that the victim suffered extreme pain for purposes of finding "serious bodily injury" and those in which the evidence was insufficient for that inference in *Bolanos*. In that case, three victims (Mejia, Rodriguez, and Gonzalez) were stabbed multiple times after a fight broke out at a playground near their high school. 938 A.2d at 676-77. This court explained that there was sufficient evidence from which a jury could infer that victim Mejia suffered extreme pain because he testified that after being stabbed he could not breathe, his muscles hurt, his chest was in pain, and he kept thinking he was going to die. *Id.* at 682. His medical records, which indicated that upon arrival to the hospital he complained of shortness of breath related to pain and was prescribed pain medicine while hospitalized and also upon discharge, corroborated his testimony. *Id.* On the other hand, there was evidence that after being stabbed, victims Rodriguez and Gonzalez were able to walk with the assistance of a nurse and a security guard, respectively. *Id.* Neither man testified to how much pain he experienced. *Id.* While a detective testified at trial that both Rodriguez and Gonzalez were in pain and were given Percocet, this court concluded that his testimony was not sufficient to allow a jury to reasonably infer that Rodriguez and Gonzalez suffered extreme pain due to the stabbing. *Id.*

Turning first to Clipper, the record indicates that he was shot in the left leg,

close to his shin or fibula, and that another bullet grazed his left foot. Clipper testified that he "knew his bone was broke[n]" and described his pain as a "7 or 6" out of ten. After being shot, he was able to hop on his right leg to the median in the center of North Capitol Street. Clipper required urgent medical treatment for his broken leg and was given intravenous morphine, though he was discharged from the hospital the same night. Though he had a broken fibula or tibia, no surgery was required. Clipper was prescribed Percocet, Tylenol 3, and medication to treat an infection, but he took only the infection medication. He was in a cast and used crutches for a month to heal his broken leg, and was on bed rest for an unknown amount of time afterwards to heal. There were no medical records introduced regarding Clipper's injuries.

Looking at the nature and extent of the injuries described in the record and the high threshold of injury required for AAWA, we are satisfied that a reasonable juror could not find that Clipper suffered the level of pain necessary to find that he suffered a serious bodily injury. Unlike in *Anderson*, where the victim testified that her stab wounds were very painful, and *Bolanos*, where victim Mejia testified that after being stabbed he could not breathe, his muscles hurt, his chest was in pain, and he kept thinking he was going to die, all of which was corroborated by his medical records, there is no such evidence that Clipper suffered similar pain here. Instead,

Clipper testified that his pain level was only a seven or a six out of ten, and though he was prescribed additional pain medication, he never took it. Furthermore, unlike in *Anderson*, no surgery was required to mend Clipper's broken leg, and while it is not clear whether Clipper could walk like victims Rodriguez and Gonzalez in the *Bolanos* case, he was at least able to hop on his uninjured leg into the safety of the median. Under these circumstances, especially considering that Clipper's own testimony was that his pain level was only a seven or six out of ten and that he did not continue to take pain medication after being released from the hospital, a reasonable jury could not find that he suffered the level of extreme pain necessary to find "serious bodily injury."

Victim Williams did not testify at trial, but evidence of the nature and extent of his injuries was presented by his treating physician, Dr. Philip Fidler. The record indicates that Williams was shot four times, twice below the right shoulder blade (near the collarbone), and twice to the left forearm. Williams was rushed to the hospital and given intravenous pain medication. Dr. Fidler testified that Williams was "reasonably stable" upon arrival, with minor heart rate and breathing issues, and was complaining of pain, though he did not testify as to how much. The two gunshot wounds to his forearm did not show signs of having injured any major blood vessels and his forearm was moving normally. The gunshots to the area below his

right shoulder blade were "through and through," meaning that the bullets passed right through his shoulder. Williams had a limited ability to shrug his right shoulder and some weakness, which was judged to be secondary to pain. Dr. Fidler testified that Williams did not appear to have a life-threatening injury when he was brought in, and he was discharged the next morning. Dr. Fidler also testified that he expected Williams to make a "functional recovery," but noted there was a possibility that he would have some ongoing nerve pain.

Under these circumstances, no reasonable juror could have concluded that Williams suffered the level of extreme pain necessary for "serious bodily injury." First, no evidence was introduced to suggest how much pain Williams experienced; rather, like in *Bolanos* where there was only the detective's assertion that Rodriguez and Gonzalez were in pain, here there was only Dr. Fidler's general assertion that Williams was complaining of pain when he arrived at the hospital. Williams did not require surgery and was released from the hospital the morning after he was admitted. There was no evidence in the record that Williams could not walk or was otherwise immobilized with pain, and no evidence that he was prescribed and/or took pain medication upon release from the hospital. Therefore, there was insufficient evidence in the record from which a reasonable juror could conclude

that Williams suffered the level of extreme pain required to prove "serious bodily injury."

### D.  Substantial Risk of Death:   Williams

The government argues that, alternatively, the jury could have found that Williams suffered "serious bodily injury" because the gunshot wounds to the area below his shoulder blade created a substantial risk of death.  Specifically, the government argues that while Williams' injuries were described as not being life-threatening once he was diagnosed at the hospital, that assessment "made in hindsight, and with the benefit of prompt emergency care, does not obviate the substantial risk of death that Williams faced . . . ."  While we understand the government's argument in this regard and have said that the severity of a victim's injuries should not be understated due to the fact that he was fortunate enough to receive proper medical treatment, *see Freeman v. United States*, 912 A.2d 1213, 1222 (D.C. 2006), this court has always required some evidence that a victim's injuries created a substantial risk of death before finding that the victim suffered "serious bodily injury" under this theory.  *See, e.g.*, *id.* (medical testimony established that the victim experienced substantial risk of death for purposes of "serious bodily injury" where he suffered three gunshot wounds, one of which broke

a vertebra, lodged inside his body, and caused the loss of sensation in his lower right leg and ankle, the result of which put him at risk of paralysis and also could have resulted in a major hemorrhage leading to death given its proximity to his aorta); *Zeledon v. United States*, 770 A.2d 972, 974 (D.C. 2001) (medical testimony that the arterial bleeding and broken collarbone victim suffered was severe enough to have resulted in death if untreated was sufficient to constitute substantial risk of death). Not only was there a lack of any evidence in this case that Williams was at a substantial risk of death, but in fact, Dr. Fidler testified that upon arrival at the hospital, Williams did not appear to have a life-threatening injury and he was discharged the next morning. As such, we are unpersuaded by the government's argument that we can affirm appellants' convictions on this alternative theory.

Although we have concluded that the evidence is insufficient to support appellants' convictions for AAWA with respect to Clipper and Williams and therefore those convictions must be vacated, the evidence is more than sufficient to support a finding that appellants committed the lesser-included offense of Assault with Significant Bodily Injury. *See Collins v. United States*, 73 A.3d 974, 985 (D.C. 2013). As the jury found appellants guilty of AAWA, it necessarily would have had to find them guilty of the lesser-included offense. For that reason, we remand the case to the trial court to vacate appellants' convictions for AAWA in

connection with the shootings of Clipper and Williams and instead enter judgments of convictions for the lesser-included offense of Assault with Significant Bodily Injury and resentence appellants accordingly.

## III. Alleged *Brady* Violation

In August 2009, the defense requested that the government turn over all *Brady*[6] material. On December 7, 2009, the original prosecutor provided the defense with a set of heavily redacted handwritten notes that Detective Michael Murphy had made based on his interview of a witness (later determined to be Tyrique Williams). The only information that was not redacted was:

> B/M Dark 5'10" (skinny)
>
> Black shirt light blue
> pants or shorts.
>
> Small dreads w/ black hat.
> Could see the shooters face.

Subsequently, on February 25, 2011, a prosecutor to whom the case had been reassigned provided the defense with a "voluminous" letter pursuant to the government's disclosure obligations which included, in relevant part, the following

---

[6] *Brady v. Maryland*, 373 U.S. 83 (1963).

information:

> Victim Williams—Victim Williams provided the following information to an officer while he was at the hospital: a four-door tan truck, like an Explorer, with two black females, who had blondish hair, and two black males, the driver got out of the truck. Victim Williams also described the shooter as approximately 5'9"- 6'0, skinny, black male, with dark skin, short dreads, wearing a black t-shirt, blue shorts, and a black baseball cap, goatee, aged 22-23, used what looked like a black, "small" gun, likely .45 caliber. Please note that the government provided this information to you in its December 7, 2009, disclosure. Victim Williams indicated that he was able to see the shooter's face. At this time, the government is seeking to re-interview victim Williams to clarify whether the description of the shooter relates to the description of the individuals in the tan truck.

The trial in this case began on January 12, 2012, and after the jury was sworn, the government provided appellants with a *Jencks*[7] package that included the entirety of Detective Murphy's notes. According to appellants, the unredacted notes revealed two key pieces of evidence that the defense contends were not previously disclosed in the initial redacted notes or in the February 25, 2011, letter: (1) that Williams had identified the driver of the tan Explorer as the shooter, and (2)

---

[7] Jencks Act, 18 U.S.C. § 3500 (2001) (requiring that the government disclose to the defense statements in its possession made by any of the witnesses that will testify at trial). The Jencks Act requires disclosure "[a]fter a witness called by the United States has testified on direct examination." *Id.* § 3500 (b).

that a female in the car, later determined to be Rakiya, had given the group the finger. The defense argued that failing to timely disclose this information constituted a *Brady* violation and that it was prejudiced because had this information been disclosed sooner, the defense could have: (1) investigated who was in the tan Explorer in an attempt to assert a third-party perpetrator theory at trial, and (2) challenged the thoroughness of the police investigation, including questioning why the police never made any attempt to locate and interview the individuals from the tan Explorer given that Williams had identified the driver as being the shooter. In ruling on this issue, the trial court found, and the government concedes, that the information contained in Detective Murphy's notes was exculpatory or impeaching evidence and should have been disclosed.[8] However, the trial judge also found that the evidence contained in Detective Murphy's notes was not suppressed because the defense had the ability to use it effectively at trial and that the defense was not prejudiced by the arguably late disclosure. For these reasons, the trial court found that the failure to disclose Detective Murphy's notes in their entirety did not

---

[8] The government offers no explanation as to why all of the exculpatory information was not turned over when requested and why it was withheld until trial. As this court has repeatedly said, "a prosecutor's timely disclosure obligation with respect to *Brady* material cannot be overemphasized and the practice of delayed production must be disapproved and discouraged." *Mackabee v. United States*, 29 A.3d 952, 956 (D.C. 2011) (quoting *Curry v. United States*, 658 A.2d 193, 197 (D.C. 1995)).

constitute a *Brady* violation. Appellants take exception to that ruling.

There are three elements to a *Brady* violation: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the [government], either willfully or inadvertently; and (3) prejudice must have ensued," which means that the evidence suppressed must have been material. *Miller v. United States*, 14 A.3d 1094, 1109 (D.C. 2011) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "If the prosecution has failed to make timely disclosure of exculpatory evidence, and if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different, then the defendant's conviction cannot stand." *Id.* (citations and internal quotation marks omitted).

In *Miller*, this court explained that a *Brady* violation is a mixed question of law and fact. The trial court's legal conclusions are reviewed *de novo* and its factual determinations are reviewed under a clearly erroneous standard of review. *Id.* at 1120; *see also Mackabee*, 29 A.3d at 959. In determining whether the trial court's decision is entitled to any particular level of deference this court considers, among other things, "whether the issue to be decided more closely resembles one of

fact or of law, and whether the trial court or the appellate court is in a position to render the decision with the higher degree of accuracy." *Miller*, 14 A.3d at 1120 (citations omitted). Moreover, "[w]here the issue to be resolved is not one of historical fact [ ] relevant to the *Brady* issues," but instead "concerns the legal consequences" of historical facts, our review is *de novo*. *Mackabee*, 29 A.3d at 959 (quoting *Miller*, 14 A.3d at 1120-23) (internal citations and quotation marks omitted).

Assuming without deciding that the information was suppressed as appellant contends, we are satisfied that the outcome of the trial would not have been different. Whether the defense is prejudiced by the late disclosure of *Brady* information turns on whether the evidence that was suppressed is material; that is, whether there is a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Mackabee*, 29 A.3d at 959 (quoting *Cone v. Bell*, 556 U.S. 449 (2009)) (citations omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

In *Mackabee*, this court found that the defense suffered no prejudice due to the allegedly late disclosure of the videotaped statement containing a witness description of the shooter or the late disclosure of the identity of a government

witness who had identified two individuals other than the defendant as being the shooter from a photo array. *Id.* at 960, 963. We rejected appellant's argument that "through fuller and earlier disclosure, the defense team might have spoken with [the witness who made the photo identifications], might have been able to locate the two men who sort of look[ed] like the shooter, and might have uncovered information to undermine the government's theory that appellant was the assailant." *Id.* at 964. This was because it could not reasonably be said that earlier disclosure of this information, which might have resulted in additional investigation, necessarily would have led to the discovery of information that would have changed the outcome of the trial or "undermine[d] confidence in the verdict." *Id.* Not only was the witness who viewed the photo array the only one who identified those other two individuals as the shooters, but the court found appellant's argument that these "mis-identifications" would have directly contradicted other witness identification testimony was "little more than speculation." *Id.* at 963. Finally, the undisclosed witness's description of the shooter's clothing matched that of other eyewitnesses, which was not helpful to the appellant, at whose house a jacket matching the description was found. *Id.*

In this case, appellants have failed to explain concretely how an earlier disclosure of Williams' identification of the shooter as the driver of the tan Explorer,

or the fact that Rakiya made an antagonistic gesture out the window to Jameeka Washington, created a reasonable probability that the verdict would have been different. As previously explained, defense counsel was able to use the information concerning the tan Explorer and the antagonistic gesture Rakiya made to Washington "from the very early part of the case . . . [v]ery effectively planting the seeds of a possible third-party perpetrator theory." With respect to Williams' description of the shooter as having been the driver of the tan Explorer, the trial judge correctly concluded that the defense was not prejudiced by the late disclosure of the contents of Detective Murphy's notes because it was "just too speculative to conclude that earlier pursuit of this information would have led to a discovery of some exculpatory information . . . ." Finally, though the defense argues that it would have presented a theory of shoddy police investigation had it known earlier of Williams' identification of the shooter as the driver of the tan Explorer, the defense knew about that identification with plenty of time to call Detective Murphy at trial but chose not to do so for strategic reasons, most notably to keep Williams from being called to testify.

Moreover, eyewitness descriptions of the shooting, as well as a security video from a nearby funeral home, established that the shooter approached the victims from Randolph Place, N.W., shot them, and ran back towards Randolph Place.

Specifically, Ronald Taylor observed the shooter run around the corner onto Randolph Place and get into the passenger seat of a red van, which was then chased by the police.   When the van was finally stopped, Robin was in the driver's seat and Terry was sitting in the front passenger seat.   Furthermore, all of the eyewitnesses described the shooter as a stocky black male of medium height with his hair in dreadlocks wearing a black T-shirt, jeans, and a ski mask with holes for the eyes, a description that generally fit Terry, but not the two other men in the van. Additionally, two ski masks were discarded from the van fitting the description of the mask worn by the shooter and both contained Terry's DNA.   And finally, although his testimony was heavily impeached, Daniels testified that Terry confessed to Daniels that he was the shooter.

We also reject appellants' alternative argument that they might have been able to make use of this information to advance a theory of "shoddy" police work had the contents of Detective Murphy's notes been disclosed earlier.   According to the record before us, the full content of Detective Murphy's notes was turned over well before the opening of the defense's case-in-chief at trial and appellants made a strategic decision not to call Williams or Detective Murphy at trial.   As the trial judge correctly concluded, nothing prevented the defense from calling Detective Murphy to testify about Williams' identification of the driver of the tan Explorer as

the shooter so long as Williams was available for cross-examination. *See* D.C. Code § 14-102 (b)(3) ("A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement and the statement is . . . an identification of a person made after perceiving the person. Such prior statements are substantive evidence."). Williams' availability was discussed at various points throughout the trial and it was agreed that he could be brought into court if necessary, but the defense ultimately decided that it did not want to call Williams because he had become unreliable and uncooperative. That the defense did not want to risk Williams being called to the stand by putting on Detective Murphy does not render the content of Detective Murphy's notes suppressed for *Brady* purposes. To the contrary, the evidence was completely available to the defense, and they chose not to present it. Therefore, we are satisfied that, even as to this alternative theory, the contents of Detective Murphy's notes were not suppressed.

Thus, even had the information in Detective Murphy's notes been disclosed well in advance of trial, we are satisfied that there was no reasonable probability of a different result and, therefore, we affirm the trial court's decision that there was no *Brady* violation in this case. *Bagley*, 473 U.S. at 682.

## IV.  Evidentiary Issues

Robin challenges the trial court's decision to admit certain testimony, which he argues should have been excluded.  Specifically, Robin contends that the trial court abused its discretion:   (1) in permitting the government to elicit testimony that impermissibly bolstered Daniels' credibility, and (2) by allowing the government to bring out irrelevant and unfairly prejudicial testimony that the home of Terrell Gray ("Gray"), a defense witness, was shot at prior to the North Capitol Street shooting.

With respect to Robin's first contention, it is well-settled in this jurisdiction that not all relevant evidence is admissible, especially if "its probative value is substantially outweighed by the danger of unfair prejudice."  *Gay v. United States*, 12 A.3d 643, 646-47 (D.C. 2011).  This court reviews a trial judge's decision to admit or deny certain relevant evidence on the basis that its probative value is (or is not) substantially outweighed by the danger of unfair prejudice for abuse of discretion.  *Punch v. United States*, 377 A.2d 1353, 1358 (D.C. 1977); *see also Johnson v. United States*, 398 A.2d 354, 363-66 (D.C. 1979) (factors that should be taken into account on appellate review of a trial court decision under the abuse of discretion standard include:   (1) whether the determination was committed to the trial court's discretion; (2) whether the trial court recognized that discretion and

purported to exercise it; (3) whether the record reveals sufficient facts upon which the trial court's determination was based; (4) whether the trial court exercised its discretion erroneously; and (5) whether having found error, it was of such a magnitude as to require reversal).

On cross-examination, Daniels was impeached with evidence that, after testifying at trial against his co-defendant in a 1992 murder case, he sent letters to the judge who presided over that trial recanting his trial testimony and actually admitting to having committed the murders. Daniels testified that he was forced at knifepoint to sign the recantation and confession in that case by some friends of his co-defendant in that case. When Daniels was asked whether anyone had been prosecuted for forcing him to sign the documents at knifepoint, he answered "no" before the government's objection to the question was sustained by the trial court and further testified, without objection, that he subsequently called the prosecutor about the incident and was moved to another location. Counsel for appellant Robin then confronted Daniels with the letters and his specific claims in those letters that he cooperated with the government because the prosecutor had threatened to take away his sister's children and that he had taken a watch from a victim of that shooting that had the victim's name inscribed on it.

On redirect, Daniels repeated that after he signed the letters, he contacted the prosecutor and was moved, but this time it was over objection by appellants. The government was also allowed to elicit testimony from Daniels, over objection, that nothing happened to the co-defendant's conviction after he wrote the letters.

Specifically, appellant Robin contends that the trial court abused its discretion by: (1) prohibiting the defense from asking Daniels on cross-examination whether anyone was ever prosecuted for allegedly holding a knife to his throat and forcing him to sign the letters in which he admitted to committing the 1992 murder that were sent to the prosecutor and judge in that case; (2) prohibiting the defense from questioning Daniels about specific details involving the 1992 murder that were included in those letters; and (3) allowing Daniels to testify that he was subsequently moved from his jail cell into protective custody after the letters were sent and that the co-defendant's conviction was never overturned.

We are satisfied that the trial court did not abuse its discretion with respect to any of these evidentiary rulings. First, Daniels had already testified during cross-examination that no one had been prosecuted for allegedly holding a knife to his throat and forcing him to sign the jailhouse confession. Because the answer to that question was not stricken from the record, we fail to see how his repeating that

testimony during redirect prejudiced Robin.   Second, while the trial court prevented Robin from questioning Daniels about the specific details of the 1992 murder that were contained in the letter, the trial court did allow Robin to elicit substantial details about the murder during cross-examination, including the claim that Daniels had committed the murders, and Robin had the opportunity to use the letter to impeach Daniels' credibility.  Where, as here, there is the potential risk of juror confusion from the introduction of extrinsic evidence from an unrelated case twenty years in the past, and the trial court allowed appellants to question Daniels about the murder case as well as to use the letter's existence and the fact of the recantation to challenge Daniels' credibility, the curtailment of some additional lines of questioning about the letter that also goes to his credibility is not an abuse of discretion.  *See Porter v. United States*, 561 A.2d 994, 996 (D.C. 1989) ("[T]he trial judge has wide latitude to impose reasonable limits on cross-examination as to the potential bias of a witness based on concerns about, among other things, harassment, prejudice, confusion of the issues, or interrogation that is only marginally relevant.").

Finally, Robin's argument, that the trial court abused its discretion by allowing Daniels to testify that he had been moved into protective custody and that the defendant's conviction in the murder case was not overturned, might be more

persuasive had the defense not opened the door by questioning Daniels about the government's response to his complaints about the alleged assault during Daniels' cross-examination and had the appellants not left the impression that an innocent man was convicted on the strength of Daniels' false testimony in the prior case.

"The scope of redirect examination rests within the sound discretion of the trial court and will not be reversed absent a showing of clear abuse." *Hairston v. United States*, 497 A.2d 1097, 1103 (D.C. 1985). Redirect examination may be properly used "to deal with matters which first came up on cross-examination." *Brown v. United States*, 763 A.2d 1137, 1140 (D.C. 2000). Here, the issues involving the 1992 murder case were first raised on cross-examination by appellant and the impressions that appellant intended to leave with the jury were misleading and unfairly prejudicial. Under those circumstances, we cannot say that the trial court abused its discretion in allowing the government to rebut the impression that the government took no action in response to Daniels' complaint or that an innocent man was convicted based on Daniels' false testimony. *See (Keith) Thomas v. United States*, 978 A.2d 1211, 1239-40 (D.C. 2009) (no abuse of discretion to permit detective to testify on redirect that he believed witness's out-of-court statements because purpose was to rebut defendant's suggestion on cross-examination that the detective agreed to provide relocation assistance to witness in return for false

testimony); *see also McClellan v. United States*, 706 A.2d 542, 551-552 (D.C. 1997) (no abuse of discretion where trial court allowed redirect examination of two witnesses, who had moved out of the state because they were afraid for their own lives after witnessing a murder, after the defense on cross-examination opened the door by questioning the witnesses about untruthful statements they had given to homicide detectives).

Appellants also contend that the trial court abused its discretion when it allowed the government to question Gray about a shooting that occurred at the Gray family home but that he failed to report. Gray, who is Daniels' nephew and who had grown up next door to Terry, was called by the defense to impeach Daniels' credibility by testifying that the conversation Daniels said happened with Terry and his nephews a few days after the shooting in the basement of the Gray's new house never actually happened. Gray also testified that in his family, Daniels was known as "pretty much a liar." The government wanted to cross-examine Gray about the fact that his house had been shot up in early 2009, arguing that the expected answer to the question, that he had not reported the shooting or cooperated with the police, would lead to evidence of Gray's bias against "snitches" or "rats" (which the government had already begun probing). The defense objected to the government's attempt to introduce this line of questioning, arguing that it was completely

irrelevant to his uncle's truthfulness or to any of the events at trial because there was no connection between that shooting and the North Capitol Street shooting. They argued that allowing questions about that shooting would irredeemably and improperly inject the possibility of a vengeful motive for the subsequent shooting in this case. We disagree. A review of the record reveals that the questions complained of ("Your family was the victim of a shooting" and "You didn't help the police at all, did you?") were clearly offered to impeach Gray's testimony on direct that he was not biased against cooperating with the police. Moreover, no attempt was made by the government to tie the shooting at the Gray house to the shooting in this case and the trial court specifically instructed the jury that the questions about the prior shooting had nothing to do with the charges or the people involved in this case. Because bias is always relevant and probative and because a jury is presumed to follow a trial court's instructions, the impeachment evidence complained of here was not substantially more prejudicial than probative and, therefore, the trial court did not abuse its discretion in allowing the government to impeach Gray's claim that he was not biased against assisting the police by questioning him about his response to the prior shooting. *See Longus v. United States*, 52 A.3d 836, 850 (D.C. 2012) ("Bias refers both to a witness' personal bias for or against a party and to his or her motive to lie . . . . Bias is always a proper subject of cross-examination.") (citation and internal quotation marks omitted); *see also Zafiro v. United States*, 506 U.S.

534, 540 (1993) (a jury is always presumed to follow a trial court's instructions).

## V.  Admission of Terry's Out-of-Court Statements Against Robin

Next, Robin challenges the admission of the statements that Terry allegedly made to Daniels a few days after the shooting on North Capitol Street under the statements against penal interest exception to the hearsay rule. The specific statements Robin challenges are that Terry told Daniels:

> They threw the gun;
> They threw the gun somewhere near Ridge Road and Mount Rainier;
> the media had "gotten it wrong" when they had reported it as a drive-by shooting and that "they got out";
> we got out of the truck;
> they was outside drinking and we just walked up the streets with our heads down;
> they had parked on the side and they walked up the street and that Kwame [victim Wingard] had his head down and "they rushed him."

A defendant's confession or extrajudicial statement is generally inadmissible against a co-defendant under the Confrontation Clause of the Sixth Amendment and the traditional hearsay rules.  (*Keith*) *Thomas*, 978 A.2d at 1222.  The Sixth Amendment Confrontation Clause guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

him." U.S. CONST. amend. VI. "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross examination." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (citing *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). In *Davis v. Washington*, 547 U.S. 813, 822 (2006), the Court clarified that a "critical portion of this holding, and the portion central to resolution of the two cases now before us, is the phrase 'testimonial statements.'" While the Supreme Court has not provided an exhaustive list of what constitutes a testimonial statement, it has held that a statement is testimonial if it is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact . . . under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 51-52. In this case, the statements Terry allegedly made to Daniels were made in the privacy of the Grays' home and were made in connection with what was purportedly a casual conversation with a friend about the incident. Therefore an objective witness would not have reasonably believed that the statements would later be used against him at trial. *Id.*

While admissions of Terry's out-of-court statements did not violate the Confrontation Clause, they may nevertheless be inadmissible under the traditional

hearsay rules. *See* (*Michael*) *Thomas v. United States*, 914 A.2d 1, 12 (D.C. 2006) (explaining that hearsay statement that is non-testimonial is nevertheless subject to the traditional hearsay rules). We review *de novo* whether a defendant's statement is admissible against his co-defendant under the "declaration against penal interest" exception. *See* (*Keith*) *Thomas*, 978 A.2d at 1225.

This court has adopted a test from the Federal Rules of Evidence that governs when a declaration against penal interest is admissible. *Laumer v. United States*, 409 A.2d 190, 199 (D.C. 1979) (en banc). This test, hereinafter the *Laumer* test, states that in order for a statement to be admissible as a declaration against penal interest, the trial judge must find: (1) that the declarant made the statement; (2) that the declarant is unavailable to testify; and (3) that there are "corroborating circumstances [which] clearly indicate the trustworthiness of the statement." *Id.* at 199; *see also* (*Keith*) *Thomas*, 978 A.2d at 1228. Whether there are such corroborating circumstances that indicate the reliability of the statement is determined by considering factors such as the time that the declaration was made and to whom it was made, the existence of extrinsic evidence corroborating the declaration, and the extent to which the declaration was against the declarant's penal interest when it was made. *Laumer*, 409 A.2d at 199-200; *(Keith) Thomas*, 978 A.2d at 1228.

Here, there is no dispute that the second prong of the *Laumer* test is satisfied—that is, that the declarant is unavailable—because Terry was on trial with Robin and therefore could not be compelled to testify. However, Robin argues that the trial court erroneously found that Daniels' testimony satisfied the first and third prongs of the *Laumer* test and therefore was admissible.

With respect to the first prong, the trial judge made the following factual findings, which we reject only if clearly erroneous: (1) Daniels had a close relationship with Terry because he had been a neighbor of Terry's family for years; (2) Daniels was close to Terry's family, and he and Terry referred to one another as "nephew" and "uncle"; and (3) Terry was frequently in and out of Daniels' family's house, and sometimes Daniels would see Terry daily. Moreover, the statement was allegedly made just days after Terry was released from jail after his initial arrest for the shooting, apparently in the privacy of the Grays' home with a limited audience. Thus, the trial judge reasoned that "it's very plausible that a younger person like Mr. Terry would seek the advice of an older neighbor or family friend like Mr. Daniels, since he might believe that Mr. Daniels would be able to speak from his own experience and answer questions that he's asking about the criminal justice system and about law enforcement investigation." We are satisfied that the trial judge's

subsequent conclusion that Terry actually made these statements to Daniels, which is based on these factual findings that were not clearly erroneous, is supported by the record. Therefore, the first prong of *Laumer* was met.

With respect to the third prong of the *Laumer* test, Robin argues that there was no evidence in the record of circumstances corroborating the truth of the statements Terry allegedly made to Daniels referring to "we" and "they" because there was absolutely no evidence in the record to suggest that there were multiple shooters or multiple individuals that approached the group of victims. As such, the third prong of *Laumer* was not met and these statements were improperly admitted. We disagree.

We note that for the same reasons that the trial court found Daniels to be a credible witness, Daniels' out-of-court statements also bear other indicia of trustworthiness. *See* (*Keith*) *Thomas*, 978 A.2d at 1229; *Laumer,* 409 A.2d at 201 ("The existence of a close relationship between the declarant and the witness also may provide indications of trustworthiness."); *see also United States v. Manfre*, 368 F.3d 832, 842 (8th Cir. 2004) (upholding admission of statements "not made while facing trial, but . . . instead made casually to an intimate confidante"); *Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir. 2002) ("[S]tatements made to a family member

or perceived ally, in confidence, have previously been deemed sufficiently trustworthy.").

Furthermore, the trial judge articulated a number of specific facts that she felt constituted corroborating evidence of Terry's alleged statements to Daniels. First, while all of the evidence did suggest that there was only one shooter, that was not fatal to the government's argument because there was plenty of evidence in the record of "concerted action," such that Terry could have been recounting what happened to Daniels using "we" instead of "I" because he was thinking of all three of the defendants as having been responsible for the acts. Second, there was plenty of eyewitness testimony to corroborate the general sequence of events that Terry allegedly described to Daniels regarding how the shooting occurred—the shooter gets out of the vehicle, walks down the street, then rushes in and shoots Kwame. Three eyewitness accounts also had the shooter running back toward the red van—one eyewitness even saw the shooter get into the red van—and after a twenty-five to thirty-minute car chase, the three co-defendants were pulled out of that red van. The trial court reasoned that the inference to be drawn from the totality of the government's evidence was sufficient to corroborate the truth of the statements Terry allegedly made to Daniels.

Reviewing this conclusion *de novo*, we agree that there was sufficient corroborative evidence of the statements Terry allegedly made to Daniels to satisfy the third prong of *Laumer*. While the use of the pronoun "they" was contradicted by all of the evidence that there was only one shooter, the statements were made in confidence to Daniels—who Terry presumably trusted and had reason to believe might be able to help him—only days after the shooting, the general sequence of events Daniels described was corroborated by eyewitness testimony and DNA evidence, and the statements clearly inculpated Terry and did not attempt to shift greater blame to another. *See Harrison v. United States*, 76 A.3d 826, 836-37 (D.C. 2013) (finding that there were sufficient corroborating circumstances to justify admission of the defendant's inculpatory statement under the *Laumer* test because the statement "was made shortly after [the defendant's] arrest, to his then-girlfriend, whom he presumably trusted, . . . the statement was consistent with the testimony of several government witnesses, [and] the statement was sufficiently against [the defendant's] penal interest that a reasonable person in his position would not have made the statement without believing it to be true") (citation and internal quotation omitted). Therefore, we agree that the third prong of *Laumer* was met and these statements were admissible against Robin under the "declaration against penal

interest" exception to the hearsay rule.[9]

## VI.  Merger of Terry's PFCV Convictions

Generally, "where two predicate armed offenses do not merge, a defendant may be convicted of separate counts of PFCV relating to each offense."  *Hampleton v. United States*, 10 A.3d 137, 146 (D.C. 2010) (citations omitted).  However, even if the predicate armed offenses do not merge, multiple PFCV convictions will merge "if they arise out of a defendant's uninterrupted possession of a single weapon during a single act of violence."  *Id.* (quoting *Matthews v. United States*, 892 A.2d 1100, 1106 (D.C. 2006)); *see also Nixon v. United States*, 730 A.2d 145, 153 (D.C. 1999).  To determine whether multiple PFCV convictions were based on one act of violence, or more than one act of violence, the court applies a fact-based approach. *Campos-Alvarez v. United States*, 16 A.3d 954, 962 (D.C. 2011).  Acts are considered distinct when "a subsequent criminal act was not the result of the original impulse, but a fresh one."  *Id.* This court reviews *de novo* whether Terry's four

---

[9] Having found only one error with respect to Robin's convictions—that there was insufficient evidence to convict him of two AAWA counts (as to Clipper and Williams)—which we have remedied, we reject Robin's argument that he is entitled to further post-conviction relief based on the cumulative errors committed in the trial court.

convictions for PFCV merge.   *Nixon*, 730 A.2d at 151.

Appellant Terry argues that his four PFCV convictions should merge into one because the predicate felonies in this case "began at the same time and were committed together by means of the same act of violence involving the same weapon."   The government argues that none of the PFCV convictions merge because the victims were all shot multiple times and that a reasonable inference from the accuracy of the shots is that Terry separately targeted each of the four victims and thus, each victim represented a fresh impulse.   On the facts of this case, we disagree with both positions.   Here, there was eyewitness testimony that Terry fired his first "volley of shots" at a group of people about fifty feet away and hit two of the victims, Clipper and Williams, who were running eastbound across North Capitol Street, and that he then took several more "deliberate" steps southbound before firing his second "volley of shots," hitting Washington and Wingard, who were fleeing south towards R Street.   After a pause in the shooting, Terry took several steps before aiming his weapon and firing a separate volley of shots at victims fleeing in a different direction, thus there were at least two distinct criminal acts. While there were four victims, and all were shot multiple times, the record evidence supports only a finding that Terry fired a volley of shots in the direction of a group of people fleeing eastbound and then, after taking a few steps, fired another volley of

shots at several people fleeing southbound. There is no evidence that he aimed and fired at each of the victims separately and, therefore, we believe that Terry committed at most two separate criminal acts. In *Campos-Alvarez*, this court held that three PFCV convictions did not merge where the shooter "fired at three separate moving targets . . . albeit rapidly and in quick succession." 16 A.3d at 963. We reasoned that he reached a "fork in the road" after shooting the first victim, and "could have elected not to fire" at the others who fled in different directions, *id.* at 963-64, but that his decision to aim and fire at each of the other two victims running in different directions constituted fresh impulses to commit separate crimes. Here, eyewitness testimony supports an inference that Terry reached a "fork in the road" after shooting a volley of shots in an eastbound direction across North Capitol Street and hitting Clipper and Williams, and therefore, he committed a new offense when he subsequently turned his weapon towards those fleeing southbound down North Capitol Street and started firing, hitting Washington and Wingard. Because there was no evidence that Terry aimed and fired at each victim separately as opposed to firing a volley of shots in a particular direction, this evidence supports, at most, two convictions of PFCV.

Because there is insufficient evidence in the record to support four separate PFCV convictions, on remand, the trial court should vacate two of Terry's PFCV

convictions.

## VII.   Conclusion

Consistent with the foregoing opinion, we remand this case to the trial court with instructions to vacate Terry's AAWA convictions and Robin's AAWA convictions for assaulting Clipper and Williams, and enter judgments of conviction on those counts for Assault with Significant Bodily Injury.   Further, we remand the case for the trial court to vacate two of Terry's PFCV convictions.   In all other respects, we affirm.[10]

---

[10] During the pendency of this appeal, both appellants filed letters requesting a stay of the proceedings so they could pursue ineffective assistance of counsel claims in the trial court, which this court construed as *pro se* motions to stay the appeals.   In addition, Terry requested that this court appoint counsel to assist him in this endeavor.   At the time appellants filed their letters with the court, there was no compelling reason to grant their motions to stay the appeal because nothing prevented appellants from seeking appointment of counsel in the trial court and/or pursuing any claims that they were entitled to a new trial.   Because Robin timely filed a § 23-110 motion in the trial court alleging ineffective assistance of counsel, his motion to stay is denied as moot.   While Terry has not yet filed a motion in the trial court alleging ineffective assistance of counsel, because he was represented by the same counsel during the trial and on appeal, any § 23-110 challenge he raises will not be burdened by a showing of cause and prejudice for not filing the motion while his direct appeal was pending.   *See Little v. United States*, 748 A.2d 920, 923 (D.C. 2000) (noting that appellant was represented on direct appeal by the same counsel that represented him at trial and was thus not barred from making a collateral attack based on claims of ineffective assistance of counsel even though he

(continued . . .)

*So ordered.*

---

(. . . continued)
did not raise the issues on direct appeal) (citing *Sullivan v. United States*, 721 A.2d 936, 937 (D.C. 1998)). Thus his motion to stay the appeal is also denied. Finally, his motion to appoint counsel is denied without prejudice to his seeking appointment of counsel in Superior Court. *See Kyle v. United States*, 759 A.2d 192, 202-03 (D.C. 2000) (noting that appellant must file a § 23-110 motion "accompanied by a request . . . to the Superior Court for it to appoint appellate counsel or other counsel as § 23-110 counsel").